CLAYTON WINTON *v.* THE STATE.*

*(Nashville.* December Term, 1924.)

1. **HOMICIDE. Defendant had right to use force necessary to protect home against unlawful invasion.**

   Defendant had a right to protect his home against an unlawful invasion, and to use such force as was necessary to prevent such a wrong. (*Post, pp.* 189, 190.)

2. **HOMICIDE. Defendant, who shot officer making search without producing warrant after passions had become aroused, held not guilty of first degree murder.**

   Defendant, who shot officer searching his home without producing a warrant, on request therefor by defendant's mother, after he had become enraged, and his passions had been aroused at what he conceived to be a wrongful search, was not guilty of murder in the first degree, under Shannon's Code, section 6439, not having perpetrated a premeditated killing. (*Post, p.* 190.)

   Code cited and construed: Sec. 6439 (S.).

3. **HOMICIDE. ''Murder in the first degree'' defined.**

   To constitute murder in the first degree, under Shannon's Code, section 6439, a cool purpose must have been formed, and deliberate intention conceived in the mind, in the absence of passion, to take the life of the deceased, or, if formed in passion, such purpose must have been executed after passion has had time to subside, though purpose need not have been deliberated on for any particular length of time. (*Post, pp.* 190-192.)

   Case cited and distinguished: Rader v. State, 73 Tenn., 619.

   Code cited and construed: Sec. 4598.

4. **HOMICIDE. ''Passion'' synonymous with ''anger.''**

   "Passion," within rule that killing to constitute first degree murder must not have been committed under passion, means the same

   151 Tenn.—12.

thing as anger.    Citing Words and Phrases, First and Second Series, "Passion."    (*Post, pp.* 192-194.)

Acts cited and construed: Acts 1919, ch. 5.

Cases cited and distinguished: Stell v. State, 58 S. W., 75; Morris v. Territory, 99 P., 760; Murphy v. So. Pac. Co., 101 P., 322.

5. **HOMICIDE. Evidence held insufficient to sustain first degree murder.** Evidence *held* insufficient to sustain conviction for first degree murder, but to show that defendant shot deceased in passion aroused by deceased's search of defendant's home, without production of warrant on request therefor.    (*Post, p.* 194.)

*Headnotes 1. Homicide, 30 C. J., Section 262 (1926 Anno.); 2. Homicide, 29 C. J., Section 100; 3. Homicide, 29 C. J., Sections 92, 97, 100; 4. Homicide, 29 C. J., Section 100; 5. Homicide, 29 C. J., Section 559.

FROM WILSON.

Error to the Circuit Court of Wilson County.—Hon. J. M. GARDENHIRE, Judge.

W. S. FAULKNER and W. B. WILLIAMS, for plaintiff.

W. H. SWIGGART, Assistant Attorney-General, for the State.

MR. JUSTICE MCKINNEY delivered the opinion of the Court.

Clayton Winton, a colored boy, twenty years of age, hereinafter referred to as the defendant, shot and killed John Oakley, a deputy sheriff, on the night of December 30, 1922, at the home of his parents about one mile north of Watertown, in Wilson county.

Defendant was indicted for murder in the first degree, and was put to trial at the April, 1923, term of the criminal court.

The jury being unable to agree, a mistrial was entered, and he was again put to trial at the January, 1924, term, when the jury found him guilty of murder in the first degree with mitigating circumstances, and fixed his punishment at imprisonment in the State penitentiary for a perod of twenty-five years.

His motions for a new trial and in arrest of judgment having been overruled, he prayed and was granted an appeal to this court, and, through counsel, has filed nineteen assignments of error, the first five of which question the sufficiency of the evidence to sustain a conviction for murder in the first degree.

According to the evidence the defendant had always borne a good reputation; had never been in any trouble before, and for about two years preceding the homicide had been making his home in Lebanon attending school. In the mornings and afternoons he worked about the homes of several prominent citizens of Lebanon, and in that way earned money with which to educate himself. These parties gave him a good name.

His father and mother, George and Nolie Winton, lived in a negro settlement in the suburbs of Watertown, which is twelve miles from Lebanon. George was a confirmed drunkard, and was worthless and trifling. According to the record, Nolie was a woman of good character, and by her industry had bought her home and supported herself by taking in washing. Her dwelling house faced south and was ten or twelve feet from the street or road. It had a front and back porch, and a hallway connecting the two porches, and there were two rooms on each side

thereof. The shooting occurred in the southwest room of this dwelling, which was fourteen feet square.

On the night of December 29, 1922, the defendant had gone by train from Lebanon to Watertown to spend a few days with his mother. His father spent that night in his home, but left early the next morning, and, so far as the record shows, has not been seen in Watertown since that time.

It also appears that on December the 29th the grand jury of Wilson county found an indictment against George for public drunkenness, and on that day Oakley advised Sheriff Reeves that George was preparing to leave. On the same day that the indictment was found, Reeves had the clerk to issue a *capias* for George, and Reeves testified that he mailed same to Oakley on the afternoon of the 29th, and in due course of mail, Oakley should have received same that night or the next day. But it does not appear from the record that Oakley actually received said *capias,* or that he had same with him when he went to the home of the defendant for the purpose of arresting his father.

A little after dark on the evening of the 30th, Oakley procured Will Luck, who was marshal of Watertown, and a mechanic by the name of W. J. Hooberry to go with him to the Winton home for the purpose of placing George under arrest.

When within about one hundred thirty yards of said home, Oakley and his associates saw the defendant with two boys, and heard him say, "I have forgotten something," and thereupon turned and walked back to his home. The two boys, with whom the defendant was standing when he was observed by the officers, were in-

troduced by the defendant, and both of them testified that they saw the three officers and recognized them.

Luck admits that it was dark at the time, and that they were not on the street upon which the defendant's home was located (which runs east and west), but were on a street that intersected same, which runs north and south.

The defendant admits the circumstances set forth above, and admits that he saw the three men, but claims that he did not recognize them on account of it being dark, although he knew them and knew that they were officers, and says that their presence had nothing to do with his sudden determination to return to his home. He testified that he went back home to call "Boston," but does not show that "Boston" lived at his home, nor that he had any reason to expect to find "Boston" in his home. In fact, he was not questioned about this one way or the other.

He further testified that, upon arriving at his home, he was persuaded by his mother to remain at home with her because of the absence of his father; that he then got his pistol and proceeded to the front porch for the purpose of firing it as a Christmas celebration, when he saw Hooberry at the front gate, which caused him to re-enter the house without shooting his pistol.

When the party of officers reached the home of defendant, Luck and Oakley went around to the back of the house, leaving Hooberry at the front gate. Hooberry testified that the defendant came to the front door and opened it with his hand in his right overcoat pocket, the pocket in which the defendant admits that he had the pistol with which he subsequently killed Oakley; that the defendant's mother followed him to the door and said

to him: ''There is two men at the back door; go let them in, and don't act the fool.''

Luck testified that Oakley knocked on the rear door of the home, and that he then heard the voices of the defendant and his mother in the hallway, but did not understand what was said by them; that the defendant opened the door, and Oakley asked him if his father were there, receiving a negative reply; that Oakley told the defendant he wanted to see him, and thereupon the defendant and his mother led them through the hall and into the front room, where the shooting occurred.

Luck's statement as to what happened after they entered the room is as follows:

''Q. When you got in the room, Mr. Luck, just go ahead and tell in your own way what was said by the defendant, and what Mr. Oakley said, and tell what occurred. Talk out loud so the jury can hear you.

''A. Mr. Oakley went in front of me, and they led the way into the room. Winton stepped out towards, kinder in front of the fireplace, maybe four or five feet out there, and Mr. Oakley stepped over towards the grate and his mother. Right at the right, as you go in the door, there is a little closet there, and she stands by that, and I still stands just inside of the door. The door was standing open at the left as you come in.

''Q. You mean the door leading from the hall opened into the room so that when you turned it back it went back to the left?

''A. And I went back to the left as you go in. Just to the right of this door is a closet, on the right hand side, with a door that forms a part of the wall, and the fireplace is in the rest of the wall there.

"Q. Go ahead.

"A. I walked just in front of the door, and his mother was standing kinder to the back of me, kinder to the right and back of me, out from the closet door a piece. Mr. Oakley asked them if George was there again, and they said he wasn't there. He told them he had a warrant for him and Clayton asked him if he had a search warrant. He said: 'No; I haven't a search warrant; I don't need any search warrant.' Mr. Oakley was standing kinder just a little bit, not exactly in front of the fireplace, somewhere close to it; I don't know the exact position; and he reached around, he was facing the south talking, and Clayton Winton was in front of him, and he reached around with his left hand to pull that closet door open to see if George was in there, and Clayton jumped back. He had his hand in his right-hand overcoat pocket, and jumped back in an angry mood towards the rear of the house, and his mother holloed.

"Q. You said to the rear of the house?

"A. He backed back towards the back.

"Q. Backed back towards the south?

"A. Yes, sir; and his mother said: 'Don't do that, Clayton, don't do that'; and about that time he had already fired, and Mr. Oakley, I seen him scrambling, and he jumped back into a position in front of the place about the time he fired, maybe he had got in position by the time he fired, and that is when the firing started. Mr. Oakley shot as quickly as he got his position to shoot.

"Q. How long was it Mr. Luck, from the time Winton fired until you saw Mr. Oakley's pistol, if you did see it?

"A. It was under those circumstances there, it was pretty critical time, and I couldn't hardly tell. It was

as quick as a man of his age could get his gun out and shoot. It was all done in a few seconds.

"Q. It was all right together?

"A. Yes, sir; it was all right together.

"Q. When you saw Winton's pistol, what did you do then?

"A. When he pulled his pistol out and fired at Mr. Oakley, I pulled out mine and fired at him.

"Q. How many times did you shoot, Mr. Luck?

"A. Twice.

"Q. How many times did Winton shoot, if you know?

"A. He must have shot three or four times; I can't be positive as to that.

"Q. How many times did Mr. Oakley shoot?

"A. I think that he shot three times."

Cross-examination:

"Q. You said it was dark in there?

"A. There was a little lamp on the table.

"Q. It wasn't dark?

"A. You know what kind of a light a small lamp will give in a room.

"Q. It was not as visible as it would have been had there been a better light; that is what you mean?

"A. Yes, sir.

"Q. This boy came and answered the knock?

"A. Yes, sir.

"Q. He opened the door and you all came in?

"A. Yes, sir.

"Q. You came on down and read no warrant?

"A. No.

"Q. You didn't show any warrant?

"A.   No.

"Q.   Mr. Oakley didn't show any warrant?

"A.   Not when he went in.

"Q.   You went from the back entrance going south-wardly in that hall, on up to the front?

"A.   To the front.

"Q.   Until you came to that door on the right west-wardly that led into the southwestern room of the house; you all entered the room the shooting occurred in?

"A.   Yes, sir.

"Q.   Did you stop there and read any paper or have any conversation?

"A.   We just went into the room behind them.

"Q.   At the time you entered, no indignity, no ob-struction was offered you, or nobody with you, so far as you know?

"A.   No, sir."

The defendant's account of the shooting is as follows:

"Q.   What else did you do?

"A.   I went in home, and I called Boston, and went in the house and told my mother I was going to the enter-tainment, and she said: 'Don't leave the house to-night, son. George is out, and I want you to stay with me. I am sick.' I said: 'Well, I will go in and get my gun and go out on the porch and shoot some.' I went in the house and got my gun, and went out on the porch, and saw somebody standing there in front at the gate, and I didn't shoot. I stood out there, and then she came to me and called me and said: 'Clayton, there is somebody at the back door and knocked; go let them in.' When I went to the back door and opened it Mr. Oakley came in.

"Q. Did anybody else come with him?

"A. No, sir."

"Q. What did Mr. Oakley say?

"A. He. came in and never said nothing to me, and walked on down the hall and said: 'Nolie, where is George?' She said: 'I don't know, Mr. Oakley, he is not here.' He said: 'I will have to search for him.' She said: 'Search as much as you please, but it looks like you could show me some paper.' He said: 'I don't need any.' I walked on down the hall. I was behind him, where him and her was talking, and I went in her room and when I went in her room they stood out there, I don't know—

"Q. He and your mother?

"A. Yes, sir; and they came in the room where I was, and when he came in there was a closet right next to the door where she was, and he started to open that closet, and she said: 'It looks like you might show me some papers,' and he turned around with his pistol in his hand and said: 'This is my papers, damn you.' And I turned and started walking towards the end of the house, and he shot.

"Q. Who shot?

"A. Mr. Oakley.

"Q. Shot you?

"A. Yes, sir.

"Q. Where did the first bullet hit you?

"A. In the back.

"Q. What then. occurred?

"A. I turned around, and when I turned around Mr. Will Luck was in the door, and he began to shoot.

"Q.   Did he shoot you?

"A.   Yes, sir."

The testimony of the mother of the defendant as to what occurred is as follows:

"Q.   Aunt Nolie, on the night that the trouble occurred, what was the first you knew of these officers being there?

"A.   When they came in the rear, I told the boy. to go open the door, there was some one at the door.  He went and opened the door, and Mr. Oakley came in, and walked on up to me, and asked me where was my husband.  I told him I didn't know.  He said he would have to search for him.  I said: 'Mr. Oakley, you can search all you want to; but where is your papers?'  When I said that he said: 'I have got to search.'  And he walked into my room door; and when he went into my room door I went in behind him; and there was a little closet, the door, coming into my room like this, and went back that way and closed the door just like this, chair, like this in the door here; when he came in the grate was right over here.  I stepped up to him at the closet door, and I said: 'It does look like you could show me some papers.'

"Q.   What did he say?

"A.   He jerked out his gun and said, 'Here is my papers, damn you;' that is what he said to me.

"Q.   How did he point that pistol?

"A.   He just snatched it out, and said: 'Here is my papers, damn you.'

"Q.   When he said, 'Here is my papers, damn you,' and had the pistol out, in whose direction was it pointing?

"A. It was pointed right in towards me; my boy was standing behind me."

The defendant received two or three bullet wounds upon this occasion, from which he recovered.

Luck does not contradict the testimony of the defendant and his mother to the effect that authority to search the premises was demanded before they went into the room where the shooting occurred. The witnesses are in conflict as to whether it was the defendant or his mother who demanded a search warrant after they entered the southwest room.

The first question which it is necessary for us to determine is, do the facts detailed above, as testified to by the witness Luck for the State, when taken in connection with the physical facts and circumstances, make out a case of murder in the first degree?

The theory of the State is thus stated by the learned assistant attorney general in his reply brief as follows:

"This evidence (referring to that detailed above) clearly warrants the inference that the defendant had recognized the officers, and that he had gone home in an angry mood, for the purpose of preventing the arrest of his father. The statement made to him by his mother, which was overheard by Mr. Hooberry, clearly indicates that the defendant had made statements to his mother which indicated to her that he was about to act rashly, over her protest, and in the light of this evidence, the jury were abundantly warranted in reaching the conclu-sion that the defendant had gone to the front door, with his hand on his pistol, to prevent the entry of the officers into his father's home.

"From this purpose he was no doubt deterred by his mother, who, as she admitted, had never received anything but kindly treatment at the hands of the deceased, and the officers were admitted at her request. Angered by the action of the officer in ignoring his demand that a search warrant be produced, and pursuant to a preconceived purpose, the defendant fired at the officer without warning and without cause, and the homicide committed during the ensuing exchange of shots was clearly one amounting to murder in the first degree."

The theory of the State is based largely upon surmise rather than upon facts. For example, there is nothing in the record to indicate that the defendant knew that his father·had been indicted, or that the officers, whom he passed, were going to his home to search same. The evidence shows that his father was not at home, and there is no suggestion that he had any grudge against these officers, or that he had even had any trouble with them, or entertained any ill will towards them.

While his story about shooting his pistol may be "colorable," as suggested by the attorney general, it finds support in the testimony of Hooberry that he walked out onto the front porch, but, upon seeing him, entered the house, and, at the request of his mother, admitted the officers instead of resisting their entry into the house, which the State assumes was his purpose in arming himself. He had a right to protect his home against an unlawful invasion, and to use such force as was necessary to prevent such a wrong. He and his mother deny that the latter said: "Don't make a fool out of yourself." But, accepting Hooberry's testimony, his mother

could have referred to his contemplated act in firing his pistol from the porch, and within a few feet of the road or street.

The evidence does not support the State's theory that the defendant armed himself for the purpose of preventing the officers from entering the house.

He and his mother evidently conceived the idea that the search of their home by these officers was unlawful, because they made two requests for their authority, which was not produced.

The defendant evidently resented what he conceived to be a wrongful act, and became very angry when Oakley started to search the closet, and began shooting.

Luck, as previously stated, testified that when Oakley started to open the closet, after a demand had been made upon him for his authority, the defendant "jumped back in an angry mood," and shot.

The thing that enraged him and caused him to shoot was the searching of the premises by Oakley, which he conceived to be wrongful. If his passions were thus aroused, and, acting upon that impulse, he shot, it would not be murder in the first degree.

Section 6439 of Shannon's Code provides that:

"Every murder perpetrated by means of poison, lying in wait, or by any other kind of willful, deliberate, malicious, and premeditated killing, or committed in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, or larceny, is murder in the first degree."

A very clear and correct exposition of the characteristics of first degree murder is found in the opinion of

Judge McFARLAND, in *Rader* v. *State,* 5 Lea, 619, as follows:

"It is unnecessary to detail the testimony at any greater length. The material inquiry is, whether this testimony shows sufficient deliberation and premeditation to sustain a verdict of murder in the first degree. When the murder is not committed in the perpetration of, or attempt to perpetrate, any of the felonies named in the act of 1829, Code, section 4598, then, in order to constitute murder in the first degree, it must be perpetrated by poison or lying in wait, or some other kind of willful, deliberate, malicious and premeditated killing; that is to say, the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time—it is enough if it precede the act; but in all such cases the purpose must be coolly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside. As was clearly pointed out by the circuit judge, if there was provocation of a sufficient character, and the killing was under passion thus excited, it would

be manslaughter. But it is not every provocation that will reduce the killing to manslaughter, not even blows under all circumstances, for the resentment must bear a reasonable proportion to the provocation. Nevertheless, although there be no sufficient provocation to reduce the killing to manslaughter, still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree."

Applying this test to the facts of the case under consideration, it is apparent that the defendant is not guilty of murder in the first degree, because his act was not done coolly and in the absence of passion.

Passion and anger mean the same thing in criminal law.

In 30 Cyc., 801, passion is thus defined: "Any of the emotions of the mind known as anger (q. v.), rage, sudden resentment, or terror, rendering the mind incapable of cool reflection."

In 2 Corpus Juris, 1345, anger is thus defined: "A strong passion or emotion of the mind excited by real or supposed injury to or intent to injure one's self or others, a strong passion or emotion of displeasure or antagonism, excited by a real or supposed injury or insult to one's self or others by the intent to do such injury; a violent passion of the mind excited by a real or supposed injury, or by an injury offered to a relative or friend; passion; ire; gall; choler; indignation; displeasure; vexation; grudge; spleen; a short madness."

In 6 Words and Phrases, First Series, p. 5227, it is said: " 'Passion,' as used in a charge defining manslaughter as voluntary homicide committed under the immediate influence of sudden passion arising from an adequate cause, means any of the emotions of the mind known as 'anger,' 'rage,' 'sudden resentment,' or 'terror,' rendering the mind incapable of cool reflection. *Stell* v. *State* (Tex.), 58 S. W., 75, 76."

In the same work (Second Series, vol. 3, p. 916) it is said: " 'In common use among the people in the everyday affairs of life, the words "anger" and "passion" are interchangeable and mean practically the same thing.' *Morris* v. *Territory*, 99 P., 760, 768, 1 Okl. Cr., 617.

"The word 'passion,' as applied to a jury's action, means anger, resentment, heat, absence of reflection, disregard of the rights of others, and kindred motives. *Murphy* v. *Southern Pac. Co.*, 101 P., 322, 327, 31 Nev., 120, 21 Ann. Cas., 502."

In Webster's International Dictionary it is said: "When any feeling or emotion completely masters the mind, we call it a passion; as, a passion for music, dress, etc.; especially is anger (when thus extreme) called passion. The mind, in such cases, is considered as having lost its self-control, and become the passive instrument of the feeling in question."

Since the passage of chapter 5, Acts 1919, reducing the punishment for murder in the first degree to a minimum of twenty years' imprisonment, we have had to reverse a number of like cases, where the punishment was fixed

151 Tenn.—13.

at from twenty to twenty-five years' imprisonment, because the facts did not support the findings of the juries.

It is not likely that, in any of these cases, the juries would have found for the higher offense had the punishment been death or life imprisonment. Their verdicts have the appearance of being compromises.

The distinction between the two degrees of murder is well defined by our statutes, and the decisions of this court.

If those charged with the enforcement of the criminal laws would not insist upon convictions for first degree murder when the facts do not justify it, the result would be more affirmances in this court, and the trouble and expense of new trials would, in many instances, be avoided.

The officers of the law should be protected, and, where one is ruthlessly shot down, public sentiment often demands a severer punishment than the law provides, for, under the law, there can be no conviction for murder in the first degree where the killing was done in anger or passion.

If the punishment provided for such offenses is inadequate, the remedy is legislative and not judicial.

After a most painstaking investigation of this record, we are thoroughly convinced that the defendant shot the deceased in passion, and that conviction for murder in the first degree cannot be sustained. That element of premeditation characteristic of murder by poisoning or lying in wait is absent.

In view of the fact that the case will have to go back for another trial, we find it unnecessary to pass upon the other assignments of error.