DRYE *v.* STATE.

(*Knoxville*, September Term, 1944.)

Opinion filed December 2, 1944.

638

Frank Bryant, Thomas E. Mitchell, and D. M. Guinn, all of Johnson City, for defendant.

Nat Tipton, Assistant Attorney-General, for the State.

Mr. Justice Chambliss delivered the opinion of the Court.

This appeal is from a conviction of murder in the first degree, with a prison sentence of twenty-five years. Drye shot and killed his wife. His defense, brought here by assignments of error, is (1) that there was an absence of criminal responsibility because of insanity, and (2) that the killing was in passion under provocation and, therefore, not murder in the first degree.

Drye is a veteran of the first World War. He entered the Army in 1915 and was honorably discharged as mentally unsound, his condition being then diagnosed as dementia praecox. He was in and out of various Government hospitals more than twenty times throughout his troubled mental life during twenty-five years. The Government records show that his condition varied, sometimes diagnosed as dementia praecox, hebephrenic type (that is, characterized by silly behavior and rapid loss of mentality), or described as psychosis, maniac type, again as maniac depressive insanity. All the Veteran Hospital Clinics in Tennessee, Kentucky, Maryland and elsewhere found him seriously mentally diseased. His last hospi-

talization appears to have been in Mountain Home, Tennessee, from which he was signed out by his wife and removed while under medical care "against medical advice" in October, 1941. He had tried at different times to commit suicide. In 1937 he was adjudged "incompetent" by the County Court of Washington County and the Peoples Bank was appointed his guardian under provisions of the Uniform Veterans' Guardianship laws. This disability has never been removed. It was shown that relatives in North Carolina, where Drye was born, were insane and that he had been adjudged insane there in 1931 and committed to a hospital for treatment.

An expert testified that his type of insanity was "circular," [cyclical] going through depressions and then into periods of remission. We understand this to mean that he had clearing up periods in which he was rational and when he could and did act normally. This is a composite picture of the defendant's troubled mental life.

Some time before this tragedy he had obtained work as a butcher in the grocery store of W. T. Bond at Kingsport. He had married the deceased several years before and it is shown that, while he was devoted to her, indeed "crazy about her," to use a common phrase, she was a woman without regard for her marital vows, who persisted, despite his pleadings and protests, in cohabitation with other men. It is clear that this conduct distressed and disturbed him greatly. A few days before the homicide he went with some friends to a nearby town to investigate reports that his wife was spending week ends there with a certain man. His fears were confirmed. His wife was boarding in Johnson City. He saw her and begged her to mend her ways and not to thus disgrace him. She responded with sneers. Mr. Bond testifies that during this time he would hear Drye talking to his wife over

the phone, protesting and pleading with her and that "it would tear him to pieces and he would walk the floor, wring his hands and cry." Surely, it is not to be wondered at that his diseased mentality was seriously affected by this strain upon it. Mr. Bond testifies that on the morning of the homicide he came to the store looking like a wild man. A Mrs. Teal testified that the couple lived with her several years; that Drye was good to his wife; that sometimes when she went out and left him he would cry and pull his hair and once went out and tore up the garden he had planted. She thought him of unsound mind. A Mrs. Hyatt testified to having known the deceased to call him and abuse him over the telephone, when he would "go all to pieces."

Coming to the day and immediate incidents of the homicide, on that morning the deceased called Drye from Johnson City over the phone at the Bond store in Kingsport and told him, among other things, that she was "three times seven" and would date any one she pleased. Mr. Bond says Drye was called over the phone and he went to pieces, was nervous, shaking all over. We quote now from the brief of the Assistant Attorney-General his summary of the succeeding events:

"The plaintiff in error's reaction was instantaneous. This telephone conversation seems to have excited the plaintiff in error to some extent and his employer testifies that to him he looked like a wild man on that morning. He immediately caught a bus from Kingsport to Johnson City, upon his arrival there, he went to the home of a friend and telling the friend's wife that her husband had agreed to lend him a pistol, procured it from this woman. He then went to the home of a Mrs. Marshall, where his wife sometimes had been found. After some preliminaries, he requested Mrs. Marshall to go to the place where

his wife was then staying and to tell her that he wanted to see her at Mrs. Marshall's home. Mrs. Marshall demurred at this request and thereupon the plaintiff in error produced this pistol and told Mrs. Marshall that although she had been a very good friend of his, he would kill her if she did not go and deliver this message to the deceased. He also told Mrs. Marshall at the same time that he intended to kill deceased and her paramour.

"Mrs. Marshall no doubt persuaded by this pistol, called a taxicab and went to the house where deceased was staying for the purpose of warning her that plaintiff in error was armed and had threatened to kill her. After Mrs. Marshall got out of the cab, it returned to her home and there plaintiff in error entered it. He inquired of the driver as to the location he had taken Mrs. Marshall and upon finding this out, had the driver to carry him to a spot approximately two blocks from where the deceased was staying.

"In some manner the plaintiff in error reached the back door of the house where deceased was living and upon entering it the deceased evidently saw him and began to run. No one seems to have seen the actual homicide but suffice it to say that plaintiff in error fired two shots at deceased, one of which took effect killing her almost instantly. She ran into the yard next door and there collapsed and died shortly after her arrival at the hospital.

"As showing the sanity and clear recognition of the consequences of his act, the plaintiff in error is shown to have told the witness Blevins, who sought to disarm him, to get out of the way and not touch him. He also made the statement that the deceased had gotten what she deserved and also told this witness to take the weapon and keep it until the officers came and then give it to them.

When the officers appeared upon the scene and were investigating the homicide, the plaintiff in error is shown to have walked up to them and to have notified them that he was the man that they wanted and in response to questions, informed them that he had killed the deceased. According to the officers in question, he talked most coherently when they arrived upon the scene and the witnesses who were present testify that he calmly rolled a cigarette in the interval between his surrender of the pistol and the arrival of the officers. The record shows that he was taken to the jail and when informed of· the death of the deceased, broke down and cried. To another officer who had for service upon him a peace warrant issued at the instance of the deceased, the plaintiff in error made the statement that he wished the officer had found him that it would have saved him a considerable amount of trouble.''

As indicated by comments in this brief, the theory of the State, apparently accepted by the jury, is here, as it was on the trial, that despite the history of this man's mental condition over twenty-five years, his insanity was of the recurrent type and at this time and on this occasion he was not insane in the sense and to the extent recognized by our rule as thus reaffirmed in *Davis* v. *State*, 161 Tenn. 23, at page 33, 28 S. W. (2d) 993, at page 996: ''The general rule is that if a defendant has capacity and reason to enable him to distinguish the difference between right·and wrong as to the particular act he is then doing, he is criminally responsible for such act. Some of our later cases are *McElroy* v. *State*, 146 Tenn. 442, 242 S. W. 883; *Watson* v. *State*, 133 Tenn. 198, 180 S. W. 168, and *Bond* v. *State*, 129 Tenn. 75, 165 S. W. 229.''

Conceding, in deference to the finding of the jury and trial Judge on this question of fact, under a fair charge,

that the defendant is not entitled to an acquittal of criminal responsibility, we are not of opinion that a conviction of first degree murder is sustained by the facts.

Counsel for the defendant rely upon *Davis* v. *State, supra,* to which the State replies this is not, as there, a case of "delusion," that "there is no evidence of the presence of a delusion at any time recently prior to the homicide. The occurrences upon which plaintiff in error made up his mind to kill deceased were real and not imaginary."

The doctrine accepted and applied in the *Davis Case* was that "a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed, would have excused the defendant." It is not necessary in this case, as it was in that, to consider whether or not there was a "delusion," since here we find the "fact indeed."

The *Davis Case* not only gave recognition to the doctrine of delusion, but it and *Toler* v. *State,* 152 Tenn. 1, 260 S. W. 134, which it cites and quotes from, are two of our leading cases drawing the line of demarcation with emphasis between murder and manslaughter. In both cases convictions of second degree murder were reversed upon findings that the homicides were committed in passion aroused by adequate provocation and, therefore, justified convictions of manslaughter only. In the *Toler Case* a father slew the despoiler of his daughter; in the *Davis Case* a husband slew one he, in his insane delusion, falsely believed to be the despoiler of his wife. In both cases the holding was, as expressed in the *Davis Case,* that "If the excitement and passion adequately aroused obscures the reason of the defendant, the killing will be reduced to manslaughter," citing the *Toler Case.*

Whether or not a fair application of this rule would require a reduction in the instant case from murder in the first degree to voluntary manslaughter, we do not find it necessary to decide. But certainly, while conceding as above stated, but not deciding, that reason had not been so far dethroned as to render the killing excusable, we think it clear that the defendant did not act with that coolly formed premediated deliberation which is an essential characteristic of murder in the first degree.

██ ██ We turn for painstaking consideration of the distinguishing, essential elements of first degree murder to two leading cases, *Rader* v. *State*, 73 Tenn. 610, and *Winton* v. *State*, 151 Tenn. 177, 268 S. W. 633. In both, convictions of murder in the first degree were reversed, it being held, as expressed in the *Rader Case*, ''that the purpose to kill was formed and executed in passion, and that there was not that cool, deliberate premeditation required to constitute murder in the first degree.''

In *Winton* v. *State*, Mr. Justice McKinney quotes approvingly from the learned discussion of our statute defining murder in the first degree (Code, Section 10768) by McFarland, J., in *Rader* v. *State*. Both of these opinions emphasize, that if the killing is done in passion, the offense is not murder in the first degree; if in passion adequately provoked and acted on before the passion has cooled, it is voluntary manslaughter; and, if in passion in fact, although the provocation be insufficient to reduce the offense to manslaughter, it will nevertheless be murder in the second degree only. We quote from the Rader opinion (page 619 of 73 Tenn.) :

''When the murder is not committed in the perpetration of, or attempt to perpetrate any of the felonies named in the act of 1829, Code, sec. 4598, then, in order to constitute murder in the first degree, it must be perpetrated by

poison or lying in wait, or some other kind of willful, deliberate, malicious and premeditated killing; that is to say, the deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required. It is true it has been held several times that the purpose need not be deliberated upon any particular length of time—it is enough if it precede the act; but in all such cases the purpose must be coolly formed, and not in passion, or, if formed in passion, it must be executed after the passion has had time to subside. As was clearly pointed out by the circuit judge, if there was provocation of a sufficient character, and the killing was under passion thus excited, it would be manslaughter. But it is not every provocation that will reduce the killing to manslaughter, not even blows under all circumstances, for the resentment must bear a reasonable proportion to the provocation. Nevertheless, although there be no sufficient provocation to reduce the killing to manslaughter, still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree.''

Mr. Justice McKinney quotes from 30 Cyc., 801, this definition of passion: ''Any of the emotions of the mind

known as anger (q. v.), rage, sudden resentment, or terror, rendering the mind incapable of cool reflection.'' [151 Tenn. 177, 268 S. W. 637.]

Other apt quotations are given in this opinion, among these one from Webster's International Dictionary reading: ''When any feeling or emotion completely masters the mind, we call it a passion; as, a passion for music, dress, etc.; especially is anger called passion. The mind, in such cases, is considered as having lost its self-control, and become the passive instrument of the feeling in question.''

Could it be doubted, on the conceded facts of this case, that this afflicted mind had lost its control, that the defendant was moved by an emotion of passion springing from continued outrage upon his marital rights, culminated on this morning by this coarse and brutal notice to him of his wife's illicit intentions? That his actions in procuring the weapon and seeking contact with his wife appeared deliberate and determined, is not persuasive that his passion had cooled. Suppressed anger is a common accompaniment of passion, the deepest and most powerful emotion, and of a determination beyond control to carry through a design formed in passion. Nor is the fact that he was relatively calm after the event inconsistent. Having discharged the weapon, his mind recoiled into calm, quite naturally over the strain, he rolled a cigarette, but then his outraged love surged again and wishing that his hand had been stayed by the intervening peace warrant, he broke down and cried.

We go no further than to hold, as already indicated, that the conviction of murder in the first degree is not sustained and the judgment must be reversed and the case remanded for a new trial.