John W. Whitsett

*v.*

State of Tennessee

(*Nashville,* December Term, 1956)

Opinion filed February 8, 1957.

STEVENS & BAGLEY, TEMPLETON & THOMPSON, Fayetteville, for plaintiffs in error.

NAT TIPTON, Advocate General, for the State.

MR. JUSTICE TOMLINSON delivered the opinion of the Court.

Plaintiff-in-error, Whitsett, hereinafter called defendant, concedes his guilt of voluntary manslaughter in shooting Robert McPhearson, but insists that the evidence does not support the jury's verdict of second degree murder. The State's rather able insistence is to the contrary.

For about six years preceding the commencement of the events which ended in the death of McPhearson, defendant and his wife appear to have enjoyed a reasonably happy marriage. Then deceased and his wife moved into the community about two years before the homicide and became next door farm neighbors of defendant and wife. Their residences were apparently almost within calling distance.

In about May of 1954 defendant's wife procured employment at a clothing factory of some character located in Fayetteville. The McPhearsons were employed there. The three traveled to and from their place of employment in the McPhearson automobile. McPhearson's duties took him numerous times a day to that machine to which the wife of defendant had been assigned work. There developed between them an intimacy which culminated in their first act of sexual intercourse at defendant's home sometime in July of 1954. These acts continued with frequency in defendant's home generally, and at infrequent intervals in Fayetteville. Such relations continued until shortly preceding January of 1955 when the wife surreptitiously absented her husband's home until the homicide in August, keeping her whereabouts a secret.

As is to be inferred from that which has been stated, defendant was frequently away from home for several hours, and sometimes all night when engaged in fox hunting, or the like. Generally, in making these trips he passed the home, and in view, of deceased. The probable duration of his absence was generally known by defendant's wife and deceased.

Not long after the commencement of this affair, defendant arrived home sooner one day than expected, and

found deceased there. He apparently thought nothing of this, other than to advise his wife that it was imprudent from the standpoint of causing gossip. Not long thereafter, however, by reason of the deceased's presence in his home being again discovered, he became suspicious, and to the point of so informing his wife. This caused them to quarrel, and she slipped away that early November night. Defendant found her at her brother's home in Birmingham within a week, and brought her home.

The illicit intimacies were renewed. When the defendant again unexpectedly arrived home one day and saw the deceased at defendant's barn with his clothing in a rather disarranged condition he directly accused his wife, who was at the house, of having improper relations with this man. He slapped her, and said that he intended to take her to the home of deceased and there tell deceased and the latter's wife what he suspected. Mrs. Whitsett again slipped away during the night, and was gone only a few days when found and brought home by defendant.

Throughout this period, this wife seemed able, by her staunch denials of wrongdoing and her explanations of matters which had aroused her husband's suspicion, to leave her husband in doubt as to her infidelity. He did, however, tell the deceased to stay away from his home on pain of being killed. All relations between the two men were terminated from that time.

When this wife was brought home in December she likewise instructed deceased to stay away from her home; that their relations were permanently ended. Nevertheless, he went there one night in January following when he knew defendant to be away. Mrs. Whitsett

refused to admit him, and warned him never to come there again. He said he would not. Nevertheless, she slipped away that night because she feared deceased would persist in returning with his presence sooner or later being discovered and followed by most dire consequences. When she learned of the homicide, in order to help her husband extricate himself, in so far as she could, from his trouble, she returned from Nashville where she had been living.

Defendant, during this interim, thought his wife to be in Detroit. He decided to leave his home, go there in search of her, then procure employment at some other distant place which he had in mind with the hope that he and his wife might commence their married lives anew. To this end he had commenced negotiations as to the operation of his farm with a young man named Mills, who for more than two years had lived nearby. It was contemplated that Mill's would occupy defendant's residence.

About two hours, apparently, prior to the homicide defendant had sent his twelve year old nephew, who had lived with him after his wife's third departure, to bring Mills to his home for further discussion of their contemplated trade. In the course of such discussion, it was suggested that Mills use defendant's household furniture. Thereupon, Mills inquired as to what would happen if defendant's wife should demand this furniture.

In the course of this conversation Mills informed defendant that with great frequency when defendant left home for any appreciable period of time since July of 1954, the deceased went to that home and remained for sometime; that this occurred both at night and during

the day. Mills caused the defendant to recollect a night when the two had gone fox hunting, and for some reason had returned much earlier than expected. Whereupon Mills went to defendant's barn to get his mule, which he had ridden there. Mills then informed defendant that when the mule shied on the way to the road from the barn Mills looked around and saw the deceased crouched behind some bushes in defendant's garden behind the residence. He decided against telling defendant about it the next morning, though he initially contemplated such a course of action. The truth of the incident is verified by the wife who said that the deceased later told her that he did not believe Mills had seen him.

According to Mills, when he related these matters to defendant that August 1955 morning, the latter exhibited great emotion, but regained his composure before leaving for Fayetteville,—a trip previously planned.

Defendant appears to have had a fancy for shotguns, and other firearms. He hunted frequently. Apparently this had given him a reputation for familiarity with the quality of various makes of shotguns. With that in mind, or for some other reason, a friend by the name of Brindley requested him to buy Brindley a .16 gauge shotgun. This was done a few days before the homicide. Though defendant had two shotguns, rifle, etc., he did not have a .16 gauge shotgun. He was curious about what it would do as a firearm. So he borrowed it from Brindley, and procured a few shells for it.

On the evening before the homicide, Brindley phoned defendant's home and requested defendant's nephew, who answered the phone, to tell his uncle to bring the gun home the next morning; that he, Brindley, wanted

to go hunting. Brindley says that he repeated the request by phone the next morning.

As a result of Brindley's request, and because Whitsett was going to Fayetteville that morning, he placed this gun, unloaded, on, and at the back of, the single seated pickup truck which he used for transportation. He placed the few shells which fitted this gun in the glove compartment of the vehicle.

Shortly after defendant had commenced this previously planned journey to Fayetteville accompanied by his little nephew, he overtook a neighbor, Mrs. Porter, who was walking. She was offered, and accepted, a ride. As the three continued the journey to Fayetteville some eight miles away with defendant driving and his nephew sitting between them, defendant and this lady engaged in casual conversation about those everyday matters, which neighbors usually talk about in such a character of conversation.

On the highway on which defendant was driving, and at the outskirts of Fayetteville, was located a place of business known as Siler's Store. It was Mrs. Porter's intention to stop there. She so advised defendant. At this store there is a secondary road leading from the highway on which the defendant was driving. A short distance up this secondary road is a little settlement known as Mill Village.

When defendant's truck approached the intersection of these two roads there appeared at this intersection and turning into this secondary road an automobile being driven by the deceased with his wife seated beside him. The record is void of any intimation that defendant anticipated a meeting with McPhearson.

But when defendant recognized deceased he turned his truck up that secondary road and began to pursue the McPhearson car and, in order to overtake it, drove with an abandon indifferent of consequences and so reckless as to almost run his truck off the road on more than one occasion, and perhaps prevented therefrom only by the nephew's tugging at the steering wheel as the truck veered now and then from the curvy road. And, as he so drove, the defendant in some way got the shotgun from the seat behind him, loaded it, and began to fire wildly at McPhearson in the car ahead, indifferent of the fact that McPhearson's wife was in the direct line of fire. Probably three futile shots were thus fired along this wild drive before the McPhearson car came to a halt as it was about to be overtaken in front of the home of McPhearson's daughter.

Both men got out of their respective cars about the same time. Defendant again fired at, but missed, Mc-Phearson who approached him. But this followed by a second shot with fatal effect. When deceased fell defendant approached and beat him over the head with the steel barrel of his shotgun, using so much force as to bend that barrel. Perhaps it should be noted here that defendant had never been on that road before, and was unaware that McPhearson's daughter lived in this settlement.

Defendant, without further delay, turned his truck around, drove to the home of Brindley to whom he was returning the shotgun, told Brindley what had occurred, and came back to Fayetteville with Brindley, to the office of a lawyer.

The testimony of these men and other unimpeachable testimony is to the effect that defendant was very highly

excited and distraught. Perhaps this is not of much importance, considering what the man had just gone through, except in so far as it corroborates defendant's statement that he remembers very little about the actual pursuit. and killing of McPhearson. It is. well to add here that this record leaves the impression that the defendant was a man of good repute.

It is properly conceded by the Attorney General, *Toler v. State,* 152..Tenn. 1, 260 S.W. 134, that if the defendant had not had any suspicions or information as to his wife's infidelity prior to the morning of the conversation with young Mills, and had then killed McPhearson within the time in which he did kill him. after receiving that information, the unlawful homicide would not have arisen to a degree higher than that of voluntary manslaughter.

But the State thinks that the information given by Mills on that morning was no more than that which the defendant had possessed for more than eight months preceding this homicide; that, therefore, there had been ample time for the cooling of his passions; wherefore, that this homicide was second degree murder motivated by a desire for revenge.

This idea is refuted by the fact that defendant had countless opportunities between January and August of 1955 to kill McPhearson, and out of the presence of anybody, if the actual killing was in fact motivated by revenge produced by knowledge which had been in his possession for eight months preceding the homicide.

It is a fact, as the State says, that defendant knew of deceased's presence at his house on several occasions in the day time when the defendant was absent, and that strong suspicions were aroused. But he did not know,

until so informed by Mills, that on very many occasions during the nights, as well as the days, when defendant was absent from his home for any appreciable length of time McPhearson was there with defendant's wife. Nor did the defendant know until Mills told him that on the night of the unexpected return from the fox hunt Mc-Phearson was hiding in the defendant's garden just behind his residence.

The subsequent conduct of defendant supports only the conclusion that the additional information given to defendant an hour or less prior to this homicide removed from his mind the doubt which his wife had been able to arouse, and led him to conclude beyond controversy that McPhearson had been engaging in a systematic course of sexual intercourse with his wife when defendant was not at home. He could hardly have reached any other conclusion from the additional information given by Mills.

■■ No repetition of the facts established by this record need be had in support of the necessary conclusion that at the moment defendant pursued and killed McPhearson he was laboring under an adequately aroused passion so great as to obscure his reason. Under these circumstances "the killing will be reduced to manslaughter", *Davis v. State,* 161 Tenn. 23, 35, 28 S.W.2d 993, 996, provided the passion has not had time to cool.

The intense and adequately provoked passion under which he was laboring at this moment was produced by the additional information just furnished him by Mills. There is no other explanation for it in the light of his previous conduct for eight months prior to receiving this information, and strongly supports his testimony that

when he unexpectedly saw McPhearson just before he killed him "all of this stuff this boy had told me that morning came back to me and him riding around with his wife and both of them looked like happy and my home tore all to pieces, I don't know what happened, I lost control of myself * * *."

Nor is this conclusion rebutted by the fact that defendant engaged in casual and calm conversation with Mrs. Porter on his way to Fayetteville after being given this additional information by Mills. In a case somewhat like this one this Court took notice of the fact that "suppressed anger is a common accompaniment of passion, the deepest and most powerful emotion * * *". *Drye v. State,* 181 Tenn. 637, 646, 184 S.W.2d 10, 13. Add to that the fact that unexpectedly he met the debaucher of his wife and the destroyer of his home within an hour after he had received information correctly convincing him of that fact.

This case is very similar—though stronger in one aspect—to the case of *Davis v. State,* 161 Tenn. 23, 28 S.W. 2d 993. In that case Davis shot and instantly killed a man whom he had erroneously believed to have debauched his wife. He killed him without warning many months after he had all the information which he had at the time of the killing. He was laboring under a delusion. There the Court said:

"We are of opinion that if as a matter of fact the deceased had debauched the wife of plaintiff in error and the plaintiff in error had been apprised of that fact and *had become convinced of its truth* on the day of the wedding or *thereafter,* and, with reasonable expedition while under the influence of passion and agi-

tation produced by such information, had killed Noe, he would only have been guilty of voluntary manslaughter.'' (Emphasis supplied.)

■ This record leaves no doubt in the mind of the Court that it was the knowledge conveyed to him by Mills months after his suspicion had been aroused that convinced him of the relations between deceased and defendant's wife. His conduct within an hour thereafter establishes beyond controversy, this Court thinks, that he was at that moment acting under the influence of the passion and agitation produced by the information furnished him by Mills. This almost insane conduct is not otherwise capable of reasonable explanation. That being the plight of the case, this Court concludes that the verdict of murder in the second degree is not sustained by the evidence.

It being clear, and so conceded by defendant, that he is guilty of voluntary manslaughter, the judgment herein will be modified so as to adjudge the defendant guilty of that offense with maximum punishment fixed at two years in the penitentiary, that being the minimum allowed by law, Code, sec. 39-2410, provided the State indicates its consent thereto. Otherwise, the cause will be remanded for the fixing by the jury some maximum term of penitentiary confinement of not less than two nor more than ten years.