IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 17, 2000 Session

## STATE OF TENNESSEE v. JOSEPH MILES

**Direct Appeal from the Circuit Court for Robertson County**
**No. 96-0237     Robert W. Wedemeyer, Judge**

---

**No. M1998-00682-CCA-R3-PC - Filed February 16, 2001**

---

Defendant Joseph Miles was convicted by a Robertson County jury of second degree murder. After a sentencing hearing, the trial court sentenced Defendant as a Range II violent offender to forty years. On appeal, Defendant raises the following issues: (1) whether the evidence is sufficient to support his conviction for second degree murder, (2) whether the sentence imposed by the trial court is excessive, and (3) whether a finding of plain error pursuant to Tenn. R. Crim. P. 52(b) justifies a dismissal of charges on the ground that the State participated in a conspiracy to kill Defendant. After a review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed.**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which Jerry L. Smith, J., and NORMA MCGEE OGLE, J., joined.

Gregory D. Smith, Clarksville, Tennessee (on appeal) and Edward Earl DeWerff, Clarksville, Tennessee (at trial) for the appellant, Joseph Miles.

Paul G. Summers, Attorney General and Reporter; Todd R. Kelley, Assistant Attorney General; Thomas A. Thomas, Obion County District Attorney General, for the appellee, the State of Tennessee.

### OPINION

#### I. Facts

On December 22, 1995, Antwaun Elliott was shot to death by Defendant in the lobby of an Arby's restaurant in Springfield, Tennessee. Defendant's action was the last in a series of antagonistic encounters between Defendant and Elliott because of an affair that occurred between Elliott and Defendant's wife while Defendant was incarcerated. Defendant's wife gave birth to Elliott's child while Defendant was still in prison. During an encounter between the two men after

Defendant's release, Elliott shot Defendant in the arm. After an investigation, the State negotiated an agreement with Elliott, reducing his charge from aggravated assault to simple assault and releasing him on probation subject to judicial diversion. Defendant contends on appeal that the State's leniency regarding Elliott's punishment inadequately protected Defendant and, further, that the State's treatment of Elliott points to a conspiracy between representatives of the State and his wife to kill Defendant. Defendant also claims on appeal that after he was denied justice by the State, his only recourse was to shoot Elliott in self-defense.

Defendant did not testify at his trial. At the sentencing hearing, Defendant gave an opening statement to the court which claimed, among other things, that in December 1995 the District Attorney's office and the Springfield Police Department were involved in a conspiracy against him. Specifically, Defendant alleged that Assistant District Attorney Dent Morriss, Assistant District Attorney Lance Baker, Detective William Watkins and his ex-wife, Lisa Groves, collaborated to have him killed. Defendant claimed that Groves conveyed false stories to Elliott which caused Elliott to fear Defendant and to believe that Defendant wanted to harm Groves. At the same time, Groves told Defendant that Elliott wanted to shoot him. As a result, Defendant became afraid for his life. To protect himself, Defendant turned himself in to the authorities, Morriss and Watkins, hoping to be placed in custody for his parole violations. However, they did not put him in jail. Defendant claimed that instead, they left him free so that Elliott could shoot him. At this point Elliott had already shot Defendant once. According to Defendant, the State intended for Elliott to finish the job.

Eric Miles, Defendant's cousin, testified at trial that on December 22, 1995, Defendant called him because he wanted Miles to give him a ride. When Miles and his wife picked up Defendant, he had two guns with him. Miles did not ask Defendant what he planned to do with them. Next, Defendant said he wanted to go to his father's house for bullets. Miles dropped him off, then picked him up on another street. When Defendant got back into the car, he lit up a cigarette containing crack cocaine. Miles asked him to put it out so Defendant asked permission to smoke the crack in Miles' back yard instead. When Miles asked Defendant why he was smoking crack, Defendant replied "to keep himself numb."

As they passed a bowling alley, Defendant asked Miles to stop so that he could get out and talk with a man named "Kilo." Miles pulled up behind the car that Defendant pointed to, and Defendant exited Miles' car. Miles was distracted for a moment until his wife asked, "What is Joseph doing?" When he looked up, he observed Defendant and a boy running back and forth by a little blue car which was parked by the gas pump when they arrived. Defendant had a gun in his hand. When the boy ran across the road toward Arby's, Defendant shot at him then returned to Miles' car for his cigarettes and the other gun. Defendant said "I'll see you later, Cuz," then drove to Arby's in the little blue car. Miles' wife was frightened at this point so they left the scene.

William Watkins, a detective with the Springfield City Police Department, testified that he responded to a call regarding a shooting incident at an Arby's restaurant on December 22, 1995. Watkins arrived at approximately 10 p.m. The victim, Antwaun Elliott, was lying on the floor and

being treated by medical personnel. Watkins talked to two eyewitnesses, Billy Joe Dunivan and Lonnie Hampton, who later identified Defendant as the shooter. The next day, Detective Watkins received a phone call from Defendant who admitted shooting Elliott because he was "having trouble with him." Defendant's call came from Arkansas. Afterward, he turned himself in to the Arkansas authorities and returned to Tennessee for trial.

Lonnie Hampton testified that he was present in Arby's when Elliott was shot. The incident occurred at approximately 10 p.m. At the time, Hampton was in line with his cousin ordering food. No other customers were in the restaurant, and the employees were in the back of the building. While Hampton and his cousin were waiting for their order, Elliott quietly entered the lobby behind them. They noticed him enter, but since nothing appeared unusual they paid no further attention to him until a car squealed into the parking lot with its brakes locked. The driver, identified by Hampton as Defendant, jumped out of the car and ran into the restaurant brandishing a revolver. As Defendant came barging through one door, Elliott tried to run out the other but Defendant caught him, pulled him around, and shot him in the head. The gun was only one or two inches from Elliott's head when Defendant fired. Afterward, Defendant ran back to his car and drove off. From what Hampton could tell, Elliott carried no weapons and made no threatening moves toward the shooter–he only tried to get away.

Scarlet Leavell, the mother of the victim, Elliott, testified that Elliott was nineteen years old when he died. He was unmarried with one child which he had with Defendant's wife, Lisa Groves. Elliott was an honor student in high school and had no criminal record except for the charges which resulted when he shot Defendant. Elliott was sixteen years old and still in high school when he met Lisa. They both worked at Wendy's restaurant. Leavell disapproved of the relationship because Lisa was older than Elliott and married.

Leavell's first contact with Defendant occurred in January 1995 when Defendant called from prison wanting to speak to Elliott. Because she did not recognize his voice, she decided to listen for a while and heard Defendant say that he "was going to deal with [Elliott]." Defendant threatened Elliott again by telephone on March 25, 1995, the day that Lisa and Elliott's baby was born. Leavell reported both calls to the police. Another time, on October 15, 1995 after Defendant's release from prison, Defendant left a message for Elliott that he would be waiting for him when he got off work. Leavell contacted the police and they escorted Elliott home without incident. Additional threats against Elliott and Lisa occurred on October 19, 1995. At around midnight, Defendant came to Leavell's home, banging on the door and threatening to "take them out that night" if he could find them. The above threats occurred prior to Elliott shooting Defendant.

Lisa Groves, Defendant's ex-wife, testified that she met Elliott in 1992 while she was still married and her husband, Defendant, was in prison. Groves and Elliott began a sexual relationship. She gave birth to their son, Bryce, in March 1995. Defendant's friends and family informed Defendant of the affair while he was still in prison and Groves was two or three months pregnant. Groves described Defendant's reaction as "not happy," "violent," and "mad." When Defendant was released in September 1995, Groves informed him that she wanted to be with Elliott. Defendant had

a girlfriend by then, and Defendant knew that he and Groves would be no more than friends in the future.

Groves further testified that she recalled the day that Elliott shot Defendant. Elliott had shown up at her parents' house. Shortly thereafter, Defendant also arrived with three men in his car. Groves told them all to leave because she did not want any trouble. Elliott left first, then Defendant followed two or three minutes later. Groves did not see the actual shooting that occurred. Groves also recalled the night when Defendant shot Elliott. She and Elliott were on their way to a Christmas party. Elliott dropped her off at the party, then left to go to the store for a minute. That was the last time Groves saw Elliott alive.

After Elliott was killed, Groves' first contact with Defendant occurred in January 1996. Defendant called Groves and "talked real crazy" to her. Defendant said Elliott "deserved to die because he had tried to kill him. And don't nobody do nothing to him and get away with it." Defendant claimed that he had killed Elliott in self-defense.

Lance Baker, Assistant District Attorney for the 19th Judicial District, testified that he was the prosecutor assigned to handle the State's case against Elliott for shooting Defendant. In preparation, Baker gathered background information on Defendant and Elliott then spoke with Elliott's defense attorney and the officers involved. As a result of his investigation, Baker reduced the charges against Elliott from aggravated assault, a Class C felony to simple assault, a Class A misdemeanor, with a disposition of judicial diversion pursuant to Tenn. Code Ann. § 40-35-313. His reasons included the fact that this incident was the first reported problem between the two men and appeared that it could be a case of self-defense. Baker had also learned that Elliott had an affair with Defendant's wife while Defendant was in prison and that Defendant began to stalk Elliott after Defendant was released, confronting him repeatedly over a period of months. Baker received conflicting stories from Defendant and Elliott, but the police officers that Baker talked to believed Elliott. All things considered, Baker testified that, in his judgment, there was no doubt that Elliott would have more credibility with a jury. Since a trial on the issue of self-defense would largely hinge on who the jury believed, the State negotiated the plea agreement with Elliott.

Lois Miles, Defendant's mother, testified that she had heard rumors that Elliott was planning to shoot her son. Ms. Miles informed Defendant of the rumors before Elliott actually shot him but did not recall Defendant's reaction. Neither did Ms. Miles remember where she first heard the rumors or who told her about them.

Dr. Anne Durrant, a licensed psychologist, testified that her job included talking with persons who are incarcerated. Defendant was referred to her by a mental health counselor at Defendant's correctional facility. Dr. Durrant met with Defendant on five occasions. Defendant was having difficulty sleeping for personal reasons. Specifically, Defendant was upset with his wife, who had just given birth to a baby fathered by another man. Dr. Durrant opined that Defendant was plagued by a combination of anxiety, depression, some anger, and anhedonia (sudden lack of interest in things previously enjoyed). Defendant also suffered humiliation and embarrassment because of the

way his wife treated him. Defendant made no threats against his wife or her paramour during their sessions.

## II. Sufficiency of the Evidence

Defendant contends that the evidence adduced at trial is insufficient to sustain a verdict of guilt beyond a reasonable doubt for second degree murder. Specifically, Defendant argues that the proof presented at trial proves instead that Defendant acted in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. In other words, Defendant submits that he was only guilty of the lesser offense of voluntary manslaughter and not second degree murder. We disagree.

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Shepherd, 902 S.W.2d 895, 903 (Tenn. 1995) (citing Jackson v. Virginia, 443 U.S. 307, 322-25 (1979)); Tenn. R. App. P. 13(e). Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this Court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). Nor may this Court reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences therefrom. Cabbage, 571 S.W.2d at 835. This Court may not substitute its own inferences for those drawn by the trier of fact from circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, a crime may be established by circumstantial evidence alone. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). However, before an accused may be convicted of a criminal offense based only circumstantial evidence, the facts and circumstances "must be so strong and cogent as to exclude ever other reasonable hypothesis save the guilt of the defendant." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the jury verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In Tennessee, second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (1997). By contrast, voluntary manslaughter is "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211 (1997). Voluntary manslaughter is a lesser-included offense of second degree murder. State v. Dominy, 6 S.W.3d 472, 477, n. 9 (Tenn. 1999). The record shows that the trial court gave the jury proper instructions on the lesser offense.

In his brief, Defendant relies on three cases decided by the Tennessee Supreme Court to support his request that this Court reduce his conviction from second degree murder to voluntary manslaughter: Whitsett v. State, 299 S.W.2d 2 (Tenn. 1957); Drye v. State, 184 S.W.2d 10 (Tenn. 1944); and Davis v. State, 28 S.W.2d 993 (Tenn. 1930). Defendant's reliance on these cases is misplaced, however, for the following reasons.

In Whitsett v. State, 299 S.W.2d 2 (Tenn. 1957), the defendant, Whitsett, shot his wife's lover after he discovered that his wife was having an affair. Our supreme court reduced Whitsett's punishable offense from second degree murder to voluntary manslaughter. Here, Defendant seeks to analogize the facts in Whitsett and achieve the same result because, even though the Whitsett defendant suspected his wife's adulterous behavior for approximately eight months before the killing, notice of the possible affair for that length of time did not automatically negate a crime of passion scenario when the defendant's stress and anger continued. However, the underlying facts in Defendant's case are not sufficiently similar to those in Whitsett to cause us to reduce his offense.

Defendant ignores the fact that the defendant in Whitsett only *suspected* his wife was unfaithful until the morning of the day he shot the victim. After receiving confirmation of his wife's illicit affair, Whitsett appeared relatively calm. In reality, this was not the case. Later, when Whitsett observed the victim driving down the road looking happy while his own life had fallen apart, he lost control of himself. Whitsett chased the victim "with an abandon indifferent of consequences and so reckless as to almost run his truck off the road on more than one occasion...." Id. at 5. While careening down the road, Whitsett loaded the gun he had with him and began to fire wildly, oblivious to the fact that there were innocent people in the vicinity. After Whitsett caught and shot the victim, he proceeded to beat him in the head with the steel barrel of the shotgun, using so much force that he ultimately bent the barrel. The Whitsett court determined that the adequately provoked passion under which the defendant was laboring at the moment he committed the killing was produced by the additional information just furnished him that day. Id. at 6. In other words, when the defendant unexpectedly saw the victim shortly after receiving information correctly apprizing him of her infidelity, he lost his mind. The passion was sufficiently great as to obscure his reason. Id. Under circumstances such as these, "the killing will be reduced to manslaughter," provided the passion has not had time to cool. Id. (quoting Davis v. State, 28 S.W.2d 993, 996 (Tenn. 1930)). Further, the court in Whitsett specifically found that the verdict of murder in the second degree as defined at the time was not sustained by the evidence. Id. at 7.

Comparing the facts in Whitsett to Defendant's case, the instant record contains no evidence that Defendant was not thinking rationally or that he received any new information that might incite passion "sufficient to lead a reasonable person to act in an irrational manner" on the day that he killed Elliott. In contrast to Whitsett, Defendant had received confirmation of his wife's infidelity months beforehand. Moreover, the proof indicates that Defendant did not unexpectedly encounter Elliott as did the defendant in Whitsett, but, instead, that Defendant went searching for Elliott, methodically acquiring guns and ammunition along the way. Unlike Defendant's situation, Whitsett possessed the gun used as the murder weapon for a reason other than to shoot someone. Whitsett was returning the gun to its owner after borrowing it. There was no evidence that Whitsett intended

-6-

to shoot anyone prior to the incident. For the above reasons, we find that the cases are significantly dissimilar and, therefore, the court's holding in Whitsett does not help Defendant.

Defendant also cannot rely on the decisions in Drye and Davis because, again, the facts and circumstances deviate substantially from those in Defendant's case. First, in Drye v. State, 184 S.W.2d 10 (Tenn. 1944), the defendant was certifiably insane. The expert in Drye testified that insanity of the defendant's type was "circular," going through alternating periods of depression and remission. Just prior to killing his wife, the defendant was reported to have gone "to pieces." Witnesses testified that he was "nervous" and "shaking all over." His employer likewise testified that he looked like "a wild man." While the supreme court conceded that the defendant's reason may have not been so far dethroned as to render the killing excusable, it was clear he did not act with that coolly formed premeditated deliberation which was an essential characteristic of *first degree* murder. Id. at 12.

Secondly, the Drye court did not reduce the defendant's charge to manslaughter. The court in Drye only found that, while there may not be sufficient provocation to reduce the killing to manslaughter, "still there may be such provocation as to excite passion in fact, and if the purpose to kill is formed in passion thus excited, and executed without time for the passion to cool, it is not murder in the first degree, but murder in the second degree." Id. at 13. Put another way, the Drye court went no further than to hold that conviction of the defendant for murder in the *first* degree was not sustained and, consequently, reversed the trial court's judgment.

Here, Defendant was not declared legally insane during his trial or at any time in his history. We note also that the passion which provoked the Drye defendant was significantly more than that passion evinced in Defendant's circumstances, and still the Drye court did not reduce the charge to voluntary manslaughter. Defendant's reliance on Drye is thus unfounded.

For similar reasons, Davis v. State, 28 S.W.2d 993 (Tenn. 1930), does not support Defendant's argument. The defendant, Dr. Davis, was found to be operating under an "insane delusion" when he killed the man who he falsely believed to be having an affair with his wife. At the conclusion of his trial, the jury found Dr. Davis insane on the subject of the victim's relations with his wife, but nevertheless found him guilty of second degree murder. At the time, Tennessee law required that Dr. Davis be found guilty if he was able to distinguish right from wrong at the time of the crime. The supreme court subsequently reversed Dr. Davis' conviction, recognizing the doctrine of insane delusion: "a homicide committed under an insane delusion is excusable, if the notion embodied in the delusion and believed to be a fact, if a fact indeed would have excused the defendant." Id. at 996. Because Dr. Davis was so deranged on the subject of his wife's supposed relations that he remained deaf to the voices of reason and conscience, the supreme court found that he was therefore possessed by an insane delusion. And, a defendant acting under such temporary mental stress is presumed to be incapable of malice, a then essential element of murder. Id. at 996.

Unlike Davis, the record in Defendant's case presents no proof that he was acting under any type of "insane delusion" at the time he committed the killing. Defendant's reliance on Davis is therefore misplaced.

The evidence in this case, when viewed in the light most favorable to the State as it must be, supports Defendant's conviction for second degree murder. Second degree murder is "[a] knowing killing of another." Tenn. Code Ann. § 39-13-210 (1997). A person acts "knowingly" with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Id. § 39-11-302(b). The proof adduced at trial established that Defendant prepared to kill Elliott. The evening that Defendant committed the crime, he was armed with two guns. Defendant had his cousin then drive him to a place where he could pick up bullets. When Defendant encountered Elliott, he chased him, fired at him, then returned to Miles' car for his other gun and cigarettes. Immediately afterward, Defendant pursued Elliott to Arby's restaurant where he grabbed him and shot him in the head at close range. Clearly, Defendant committed a knowing killing. Furthermore, we find no evidence of a state of passion, insane delusion, or any other mental state which would reduce the offense to voluntary manslaughter.

When reviewing a trial court's judgment, this Court will not disturb a verdict of guilt unless the facts of the record are insufficient as a matter of law for a rational trier of fact to find the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U,S. 307, 318, 99 S.Ct. 2781, 2789 61 L.Ed.2d 560, 573 (1979). Accordingly, we conclude that the evidence in the record was clearly sufficient for a rational jury to find Defendant guilty of second degree murder. Defendant is not entitled to relief on this issue.

Defendant also argues that because the original indictment for first degree murder was never formally amended to reflect the lesser charge of second degree murder, the case against him should be dismissed or remanded for new trial. The indictment charges Defendant with the offense of premeditated first degree murder. The judgment shows that the indictment was amended to charge the lesser-included offense of second degree murder, but the record does not reflect exactly when, why, or under what circumstances the amendment of the indictment occurred. The jury verdict form indicates the "charged offense" was second degree murder. Since the record does not show the circumstance of the amendment to the indictment, it does not reflect any objection by Defendant to the amendment. Neither was the amendment of the indictment included in the motion for new trial. This issue is therefore waived. See Tenn. R. App. P. 3(e); State v. Caughron, 855 S.W.2d 526, 538 (Tenn. 1993).

Even if not waived, Defendant has suffered no prejudice. Second degree murder is an included charge within an indictment charging first degree murder. See State v. Dominy, 6 S.W.3d 472, 477 (Tenn. 1999) (lesser-included offenses are included in the offense charged and may form the basis of a conviction); State v. Bolden, 979 S.W.2d 587, 593 (Tenn. 1998) (second degree murder is a lesser-included offense of first degree murder). The proof adduced at trial, in fact, would have supported a conviction for first degree murder. However, for whatever reason, the trial court

-8-

amended the charge, presumably at the request of the State. Defendant's assertion that the conviction should therefore be reversed and dismissed or remanded for a new trial is without merit.

### III. Length of Sentence

Defendant contends that the trial court erroneously imposed a longer sentence than he deserves. Defendant does not dispute the fact that he was sentenced as a Range II offender. Instead, Defendant argues that the sentence should be twenty-five years, the minimum in the range, because Defendant's compromised state of mind and the victim's actions somehow partially justify or excuse his actions. We disagree.

"When reviewing sentencing issues ... including the granting or denial of probation and the length of sentence, the appellate court shall conduct a de novo review on the record of such issues. Such review shall be conducted with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn.Code Ann. § 40-35-401(d) (1997). "However, the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn.1991). In conducting our review, we must consider all the evidence, the presentence report, the sentencing principles, the enhancing and mitigating factors, arguments of counsel, the defendant's statements, the nature and character of the offense, and the defendant's potential for rehabilitation. Tenn.Code Ann. §§ 40-35-103(5), 210(b) (1997 & Supp.1999); Ashby, 823 S.W.2d at 169. "The defendant has the burden of demonstrating that the sentence is improper." Id. Because the record in this case indicates that the trial court properly considered the sentencing principles and all relevant facts and circumstances, our review is de novo with a presumption of correctness.

Defendant was convicted of second degree murder, a Class A felony. See Tenn. Code Ann. § 39-13-210(b) (1997). The sentence range for a Range II offender convicted of a Class A felony is between twenty-five and forty years. Tenn. Code Ann. § 40-35-112(b)(1) (1997). The presumptive sentence for a Class A felony is the midpoint of the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c) (1997). If the court finds that enhancement and mitigating factors are applicable, the court must begin with the midpoint and enhance the sentence to appropriately reflect the weight of any statutory enhancement factors and then the court must reduce the sentence to appropriately reflect the weight of any mitigating factors. See State v. Chance, 952 S.W.2d 848, 850-51 (Tenn. Crim. App.1997).

During the sentencing hearing, the trial court found the following enhancement factors applicable: (1) the defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; (8) the defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community; (9) the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense; (10) the defendant had no hesitation about committing a crime when the risk to human life was high; and (13) the felony was committed while on release

status (parole) from a prior felony conviction. See Tenn. Code Ann. 40-35-114 (1), (8), (9), (10) and (13)(B) (1997). Because the majority of Defendant's criminal history was utilized to achieve Range II offender status, the trial court gave enhancement factor (1) some weight but, in the court's words, "not a tremendous amount." The remainder of the factors were given substantial weight, however. Specifically, Defendant's sentence was enhanced because Defendant was found unwilling to comply with conditions of his previous sentences involving release into the community; Defendant possessed a firearm to kill the victim (and this was not an element of the offense); Defendant's "execution style" murder in cold blood was performed without hesitation and other individuals in the restaurant were at risk; and Defendant committed the murder while on parole.

The trial court also considered two mitigating factors: (2) the defendant acted under strong provocation; and (3) substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense. See Tenn. Code Ann. 40-35-114(2) and (3) (1997). The trial court then determined that defendant was entitled to "some mitigation" under factor (2) because when "you are shot by another individual, you are going to have less than kind feelings toward that individual thereafter." The court further found no reason to "excuse or justify the defendant's conduct" in accordance with mitigating factor (3). In sum, the trial court concluded that mitigation, what little there was, was far outweighed by the enhancing factors.

Next, the trial court began at the midpoint of the range for Defendant's sentence, thirty-two years and six months. The record reveals that the court considered the evidence presented at trial and at the sentencing hearing; the presentence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; and the information offered by the State and Defendant regarding enhancement and mitigating factors. Furthermore, in accordance with the purposes outlined in Tenn. Code Ann. § 40-35-102, the record shows that the trial court deliberated on the need to provide an effective general deterrent, restrain defendants with lengthy histories of criminal conduct, encourage rehabilitation where feasible and impose confinement where it is necessary to protect society and where measures less restrictive than confinement have frequently or recently been applied unsuccessfully. The aforementioned considerations, examined in light of Defendant's attitude and philosophy (i.e., Groves' testimony at the sentencing hearing that Defendant had said, "Don't nobody f— with Joseph Miles"), caused the trial court to determine that a fair and just sentence in Defendant's case would be the maximum, forty years.

Defendant does not challenge the application of the enhancement factors per se, but maintains that because Defendant's victim had an affair with his wife, shot him in the arm on a previous occasion, and then flaunted the fact that the State "approved" of his victim's actions by not incarcerating him, this Court should reduce his sentence to the minimum in the range. We do not agree. Defendant cites no precedent in Tennessee case law to support such expectations. The proper statutory starting point for Defendant's sentence is thirty-two and one-half years. See Tenn. Code Ann. § 40-35-210(c) (1997). We conclude that four heavily-weighed enhancement factors taken in conjunction with one comparatively insignificant mitigating factor is quite sufficient to raise the

sentence seven and one-half years from its statutory midpoint to forty years. The trial court imposed an appropriate sentence in this case. Defendant is not entitled to relief on this issue.

## IV. The Conspiracy Theory

Lastly, Defendant contends that the doctrine of plain error pursuant to Tenn. R. Crim. P. 52(b) justifies dismissal of the charges against him on the ground that the State participated in a conspiracy to kill Defendant. Specifically, Defendant argues that the State "set up" Defendant to be killed by Elliott when it refused to incarcerate him for shooting Defendant in October 1995. Defendant claims that because he is an "ex-con," the State declined to adequately protect him. This refusal subsequently forced Defendant into a "kill-or-be-killed" situation, a "show-down" of sorts, which resulted in Elliott's untimely death. Defendant contends that if the State had done its job, Elliott would be alive today. We disagree.

Rule 52(b), Tenn. R. Crim. P., is known as the "plain error" rule. It provides that "[a]n error which has affected the substantial rights of an accused may be noticed at any time, even though not raised in the motion for a new trial or assigned as error on appeal, in the discretion of the appellate court where necessary to do substantial justice." A plain error is not just an error that is conspicuous, but "is an especially egregious error that strikes at the fairness, integrity, or public reputation of judicial proceedings." State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994).

We find no error in the record before us which rises to the level of "plain error" contemplated by Rule 52(b), and no support or evidence for Defendant's conspiracy theory in the trial record or Defendant's brief. Defendant cites United States v. Grostefon, 12 M.J. 431 (Ct. M. App. 1982), but this opinion has no practical application to the matter before us. Issues which are not supported by argument, citation to [relevant] authorities, or appropriate references to the record will be treated as waived by this Court. See Tenn. Ct. Crim App. R. 10. Defendant is not entitled to relief on this issue.

## V. Conclusion

Based on all the foregoing, the judgment of the trial court is AFFIRMED.

_____
THOMAS T. WOODALL, JUDGE

-11-