IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs November 5, 2002

## STATE OF TENNESSEE v. EZELL WALLACE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-10712    Otis W. Higgs, Judge**

**No. W2002-00266-CCA-R3-CD  - Filed July 14, 2003**

A jury convicted the Defendant of attempted first degree murder, a Class A felony.  The trial court sentenced the Defendant as a Range I, standard offender to twenty-five years' incarceration.  The Defendant now appeals, arguing that the trial court erred by denying his motion for new trial because (1) insufficient evidence was presented to support his conviction; (2) the trial court made an improper evidentiary ruling; and (3) the trial court gave the jury improper and inadequate instructions.  Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Brett B. Stein, Memphis, Tennessee, for the appellant, Ezell Wallace.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; William L. Gibbons, District Attorney General; and Greg Gilluly, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### I. FACTUAL BACKGROUND

The following evidence was presented at the Defendant's trial: Helen Williams, the victim in this case, testified that she had lived in Memphis all of her life.  She stated that she had seven children and that she had three children with the Defendant.  The victim testified that she had known the Defendant since she was in fourth or fifth grade and that they grew up in the same neighborhood.  She stated that she and the Defendant were married.

The victim testified that at some point during their marriage, the Defendant began to act very jealous.  She stated that the Defendant constantly accused her of cheating on him.  She reported that the Defendant called places where she said she was going to make sure that she was actually there.

The victim maintained that the Defendant was very controlling, and she claimed that the Defendant eventually became violent.

The victim recalled that on March 30, 1999, she was at the home of the Defendant's sister helping the Defendant's mother with a cellular phone bill. She testified that she often had to help the Defendant's mother because her mother-in-law could not read very well. The victim indicated that the Defendant also had a phone listed in his mother's name. She recalled that the phone bill was exceptionally high that month because the Defendant "was talking . . . for hours to a woman he was having an affair with . . . several women . . . and he got upset."

The victim testified that she told the Defendant that she did not want to catch AIDS, and they got into an argument. She reported that the Defendant threw a clothes bin at her, pushed her down, and kicked her in her hip area. The victim testified that at that time, she was pregnant with the Defendant's child. She stated that she called the police, and they arrested the Defendant. The victim explained that the Defendant was released on bond and that one of the conditions of his release was that he not have any physical or verbal contact with her.

The victim testified that the Defendant, in defiance of one of the conditions of his release on bond, called her. She recalled that the Defendant told her that "it wouldn't happen again" and that he wanted them to have "a better marriage and so forth." The victim testified that she believed the Defendant and allowed him to move back home with her and her children. She testified that she needed money to support her children, and the Defendant helped pay the bills. She acknowledged that she wanted her children to have a father. The victim testified, "He did pretty good for like a couple of days, and then it was back to the same old routine." She explained that the Defendant was jealous, suspicious, and controlling.

The victim testified that on December 31, 1999, she and the Defendant had a New Year's Eve gathering at their home, and a number of family members and friends attended. She recalled that on that evening, the Defendant was acting "anti-sociable." She observed the Defendant pace back and forth between the living room and their bedroom. The victim stated that the Defendant appeared to be upset because she was having a good time.

The victim testified that the Defendant's niece, Octavia Rivers, took care of the victim's baby during the party. The victim reported that Rivers often took care of and held the baby when she visited. The victim testified that "all of a sudden out of the blue" she heard Debra Rivers, Octavia Rivers' mother and the Defendant's sister, yell at the Defendant. According to the victim, Debra Rivers told the Defendant that just because he was mad at the victim, he should not "fuck with [her] child like that."

The victim testified that she had told the Defendant prior to the party that she was going to have a good time at the party and that he could join in. She stated that "one word led to another," and she and the Defendant got into an argument which "ruined the party." The victim testified that

at some point, the Defendant pushed her. She acknowledged that many party members became involved, but things eventually calmed down.

The victim testified that close to midnight, they opened the champagne for the New Year's celebration. She recalled that everyone except the Defendant seemed to be having a good time. The victim stated that the party ended, and everyone went home. She testified that the next morning, she and the Defendant got into an argument about the party, but they reconciled. She testified that her newborn son slept in the bed with her and the Defendant. The victim testified that on January 2, 2000, the Defendant appeared to be fine, and she, the Defendant, and the baby all slept in the bed together as usual that night.

The victim recalled that on January 3, 2000, she went to her father's house for a while, and he later brought her home. She stated that on the way home, she stopped at the Family Dollar store to buy some cleaning supplies and batteries for a toy that her son received for Christmas. The victim testified that when she returned home, she learned that the Defendant and her thirteen-year-old son, Adam, had had a "confrontation about something." She stated that the Defendant told her that Adam had "slammed" a chair and broken it. The victim testified that she called the police, and they took Adam to LeBonheur Hospital. The hospital called the victim and indicated that she needed to come to the hospital because they were going to evaluate Adam. She stated that the Defendant went with her to the hospital and did not appear to be upset.

The victim reported that after she and the Defendant left the hospital, they walked to the home of her niece, Ramona Stewart. She stated that she talked to her sister and niece for a few minutes, and then she and the Defendant walked to Jackson Corned Beef, where the Defendant's mother worked. The victim called her father, who picked them up at Jackson Corned Beef and took them home. She recalled that it was around 10:00 or 11:00 p.m. when they arrived home. The victim testified that she put her children to bed, and the Defendant stayed in the living room watching television. She stated that she went into her bedroom, took off her clothes, and lay down in the bed with her baby. The victim reported that she kept a phone in her room beside her bed.

The victim testified that she awoke in the early morning hours of January 4, 2000 to "a sharp pressure and pain to the right side of [her] neck." She stated that she "jumped up and sat on the side of the bed," and she was having trouble breathing. The victim recalled that the Defendant turned on a light, and then he walked toward her with a butcher knife. She stated that as blood was flowing down her neck, she asked the Defendant why he did "that." The victim testified that the Defendant did not respond. She reported that the Defendant "tried to cut [her] again," and she held her arm up in defense. She stated that the Defendant cut her arm with the knife. The victim testified that the Defendant then stabbed her a couple more times. She noted that she kept asking the Defendant, "What's wrong?" The victim stated that the Defendant never responded, but instead, he "kept trying to cut [her]."

The victim testified that she pleaded with the Defendant to call 911, and she told him that she would tell police that someone broke in and cut her. She stated that she told the Defendant that

she could not breathe. The victim testified that she was eventually able to grab the blade of the knife, and it fell on the floor. The victim testified that the Defendant asked her where he could find her money because she had just cashed her paycheck. She stated that the Defendant then hit her face a couple of times with his hand, chipping two teeth. The victim testified that while the offense was happening, her baby was not in the room, and she was worried about what might have happened to her children. She identified the knife in court. She also identified photographs of her bed with her blood on it.

The victim testified that the phone that was always beside the bed had been taken out of the room. She recalled that the Defendant eventually left the bedroom and came back with a phone. The victim testified that while the Defendant was in the other room, she pulled the alarm box on the window loose. She stated that the Defendant came back with the phone, and he appeared to be talking to a 911 operator. She recalled yelling "help" while the Defendant was on the phone.

A tape of the 911 call was introduced into evidence and played for the jury. On the tape, a male requested that an ambulance be sent to 1399 Bowen because his wife was hurt. The caller stated that "she cut herself" in the neck. The 911 operator told the caller to get a cloth, put it on the victim's wound, and apply steady pressure. When the operator asked what happened to the knife, the caller said, " I took it away from her."

The victim testified that the Defendant lied on the tape and that she did not cut herself. She recalled that after the Defendant called 911, he "left out the back door." The victim testified that she got up and called 911. She reported that she was bleeding and that she was having trouble breathing.

The tape of her 911 call was entered into evidence and played for the jury. On the tape of the victim's call, she stated that she needed an ambulance because she had been stabbed in her neck. When asked who stabbed her, she responded, "My husband." She stated that the police were chasing her husband.

The victim testified that instead of helping her and applying pressure to the neck wound, the Defendant took her money and left. The victim stated that after the Defendant left, she walked to the front of the house and went into the kitchen. A photograph of the kitchen with blood on the floor was introduced into evidence. The victim showed the jury several scars resulting from the offense. She showed the jury scars on her hand, neck, chest, and arms. She acknowledged that at the time of the offense in this case, the Defendant had been released on bond and had agreed as a condition of his release not to have any contact with the victim.

The victim reported that after she called 911, she called her father's house. She stated that the police and an ambulance arrived. She testified that she was able to walk outside and get into the ambulance. The victim stated she was taken to The Med Hospital and that her condition was critical. She later learned that her cartoid artery had been cut. The victim was in the hospital for three days.

According to the victim, the Defendant was released on bond, and once again, the Defendant was ordered as a condition of his release not to have any contact with the victim. She stated that she had also obtained an order of protection against the Defendant. The victim testified that at the hearing for the order of protection, the Defendant denied cutting her. She stated that the Defendant later changed his story.

The victim testified that while the order and bond conditions were pending, the Defendant came to her house and looked in her windows. She stated that the Defendant also called her home. The victim testified that a new warrant for harassment and for violating bail conditions was issued against the Defendant, and the Defendant was convicted on those charges. She reported that the Defendant and the Defendant's mother called her about this case. A tape of a call by the Defendant was entered into evidence and played for the jury.

According to the victim, the Defendant stated on the tape "[t]hat if he wanted [her] that bad, he know where [she] stay [sic]." She testified that the Defendant said he was sorry if the victim thought that he was the person outside her house. The victim stated that the Defendant told her that he was guilty only of loving her and missing the children. She stated that the Defendant said he would never do anything like that to her again. The victim denied being verbally abusive towards the Defendant. However, she acknowledged that when they argued, they "cuss[ed]" each other.

On cross-examination, the victim testified that she was thirty-two years old and that she had known the Defendant since the fourth grade. She believed that she married the Defendant in September 1997. However, she acknowledged that they had been living together before they got married and that they had three children. The victim testified that her relationship with the Defendant was good immediately after their marriage, but she reiterated that at some point, their relationship deteriorated. She estimated that her marriage was good for less than a full year.

The victim stated that she and the Defendant would occasionally host gatherings at their house. She denied that she was verbally abusive to the Defendant. She also denied that she ever said disparaging or embarrassing things about the Defendant's sexual ability in front of other people. She stated that she and the Defendant "argued all the time" and would do so even when friends and family were present. The victim testified that the Defendant's family did not confront her about making fun of the Defendant, but instead, they told the Defendant that he should not act so jealous of the victim.

Regarding the New Year's Eve party, the victim acknowledged that she had been drinking, but she maintained that she was not intoxicated. She stated that she did not have an altercation with the Defendant's sister, Debra Rivers, at the party. The victim denied that Rivers told her that she was tired of the victim embarrassing her brother in public.

The victim testified that she loved the Defendant's mother and often helped her with various things. She maintained that after she was stabbed, she never went to visit the Defendant's mother while the Defendant was living there. The victim testified that after the Defendant stabbed her, he

took approximately $260 from her. She acknowledged that over the years, the Defendant had done the best he could to support the children.

The victim testified that while she was in the hospital, she gave police a statement regarding the offense in this case. She admitted that she did not mention that the Defendant had taken any money. The victim testified that in 1989, she was convicted of second degree murder and received a ten-year sentence.

On re-direct examination, the victim testified that even though the Defendant knew she had been convicted of murder, he still married her. She stated that she voluntarily went to the police and admitted what she had done in the second degree murder case.

Officer Curtis Price of the Memphis Police Department testified that he had responded to a previous domestic violence complaint by the victim. He stated that he also responded to a 911 call from the victim's home at approximately 2:00 a.m. on January 4, 2000. Price recalled that the call alleged domestic violence. He stated that when he arrived at the scene, he observed the victim standing on the front porch, holding her neck with blood all over her night clothes. He also observed the Defendant standing at the northwest corner of the house. Price testified that as soon as he drove up to the house, the Defendant "took off running southbound away from the house." He indicated that he radioed for help, and then he and Officer Murphy began to chase the Defendant on foot while Officer Gaiter remained at the scene. Price testified that they were able to apprehend the Defendant when he failed to jump a fence. He identified photographs of the Defendant in which the Defendant had blood on his clothing.

Price testified that officers collected evidence from the scene, including the knife used in the offense. He stated that the children were all asleep in another bedroom. He testified that when the victim left the scene in an ambulance, she was reported to be in critical condition.

Officer Tim Murphy of the Memphis Police Department testified that on January 4, 2000, he responded to what was originally characterized as an attempted suicide at the victim's home. He recalled that just before he arrived at the residence, he received another call which indicated that there had been a stabbing. Murphy testified that he assisted Officer Price in pursuing and arresting the Defendant. He identified a photograph in which someone is pointing to blood on the Defendant's shirt.

Debra Rivers, the Defendant's older sister, testified for the defense. She stated that she had four children, all of whom lived with her, and one grandchild. Rivers testified that about two years prior to trial, she began visiting with the Defendant and the victim regularly. She recalled the New Year's Eve Party on December 31, 1999. Rivers testified that she and her children arrived at the party around 1:00 or 2:00 p.m. and that she left around 9:00 p.m. She stated that everyone was drinking.

Rivers testified that the victim and her niece, Mona, were "always . . . sitting around talking about [the Defendant]." She stated that the victim would tell "her people" that the Defendant's "sex ain't no good and stuff like that." Rivers also stated that the victim would tell the Defendant that he was "stupid and ignorant." She testified that when the victim talked that way to the Defendant, he just nodded his head. Rivers claimed that the Defendant looked embarrassed when the victim would "talk down" to him. She stated that although the Defendant liked to keep things to himself, she forced him to talk to her.

Rivers reported that on the evening of the New Year's Eve party, she was in the room with the victim, Mona, and several other people when the victim and Mona began "talking about [the Defendant] like they always do." She acknowledged that she could not hear what the victim was saying, but she maintained that the victim was talking about the Defendant. Rivers testified that she eventually told the victim, "I get so sick of you all. That's all you know, [the Defendant] this, [the Defendant] that." She reported that she also said, "[Y]ou act like I ain't [sic] even in the room talking about my brother."

Rivers recalled that after she said something, the victim and her two nieces "jumped up." She testified that the Defendant heard the commotion and came to the defense of his sister. Rivers testified that the Defendant said something to Mona, and Mona became "irate like she wanted to hit him." She stated that the Defendant and another man walked outside, but Mona "kept on running behind him." Rivers testified that the man with the Defendant tried to calm Mona down. She stated that she and her children then left the party.

Rivers testified that on January 4, 2000, the Defendant called her and said, "Debra, come over here and help [the victim] because her neck is broke." She stated that the Defendant also said the victim was bleeding. Rivers reported that the phone call frightened her, so she hung up on the Defendant and called her mother. She stated that she told her mother to go and get the Defendant because he was "talking crazy." Rivers testified that she was overwhelmed with fear, but she acknowledged that she did not go to the Defendant's house.

Rivers testified that she next saw the Defendant when he got out of jail and was staying at their mother's home. She maintained that while the Defendant was living with his mother, the victim "was over there the whole time." Rivers testified that the victim would come to visit and would bring the children. She stated that "[a]bout a month and a week after he got out of jail they got back together." She reported that the Defendant moved back in with the victim. Rivers testified that the Defendant loved the victim.

On cross-examination, Rivers testified that she had also been known by the name Debra Wallace before she was married. She stated that she had previously been arrested and refused to give her name to police, so they called her Jane Doe. Rivers testified that Octavia Rivers was her sixteen-year-old daughter. She acknowledged that she was arrested for assault based on an incident involving Octavia Rivers. Rivers acknowledged that withholding critical information is a form of dishonesty.

Rivers testified that she did not recall Octavia Rivers holding the victim's baby on the night of the New Years' Eve party. She stated that she was made fun of in school, but she maintained that she never cut anyone's throat because they called her a name. Rivers testified that on January 25, 2001, she engaged in a verbal and physical altercation with Octavia Rivers. She stated that she was arrested for "whipping" her daughter. She acknowledged that Octavia Rivers received injuries to her neck from the altercation.

Rivers acknowledged that she could not hear the conversation in which she alleged that the victim was talking about the Defendant. Rivers testified that the Defendant never talked badly about the victim. However, she stated that the Defendant said the victim was crazy. Rivers testified that she was aware that the Defendant had previously been arrested for assault, and following his conviction, he was ordered not to see the victim. She stated that the Defendant was supposed to live with her when he was released on bond. Rivers admitted that she was not in the victim's home when the offense occurred, so she did not know what happened.

Dorothy Wallace, the Defendant's mother, testified that she was married and that she was employed by Memphis City Schools and by Jackson Corned Beef. She stated that she had worked at Jackson Corned Beef for twenty years. Wallace testified that she had three children, including the Defendant and Debra Rivers. She testified that the Defendant was the oldest of her two sons. Wallace reported that the Defendant had known the victim since they were very young. She stated that she first met the victim when she came to her house with Wallace's other son, Antonio.

Wallace testified that she had a good relationship with the victim. She stated that the Defendant and the victim got married about three years prior to trial. However, Wallace testified that the Defendant had been living with the victim before they got married. She noted that the couple had problems, but they never discussed them with her. Wallace indicated that the Defendant was "a quiet person." She testified that the victim used to talk about the Defendant in front of her. She elaborated that the victim would say that the Defendant "ain't [sic] no good, and he can't do this, and he can't do that." Wallace testified that the Defendant heard the victim talk about him. She maintained that the Defendant loved the victim and would not complain even when he was embarrassed.

Wallace testified that after the Defendant was released from jail in connection with this case, he moved in with her. She stated that her niece, Kena Clayborn, was also living with her at the time. Wallace testified that while the Defendant was living with her, the victim came to her house everyday. She stated that initially, the Defendant left whenever the victim came over. However, she testified that the Defendant talked to his pastor, who told him that he did not have to leave his home, so after that, he stayed home when the victim came to visit. She stated that she loved the victim. Wallace testified that eventually, the Defendant moved back in with the victim and lived with her for about six months.

Wallace testified that she saw the Defendant and the victim on the evening of the offense because they came to visit her at her place of employment. She recalled that both the Defendant and

the victim seemed fine. She stated that the Defendant sat by the window while she talked to the victim at the counter. Wallace testified that she gave the victim some money. She reported that she found out about the incident in this case when her niece told her that the victim had been injured. She stated that she drove to the victim's home, where she saw an ambulance and police. Finally, Wallace testified that she had been convicted of possession of a weapon probably within the last five or six years.

On cross-examination, Wallace testified that she had been convicted of possessing a sawed-off shotgun. She agreed that people in marriages sometimes argue, but she acknowledged that arguments were not an excuse for violence. Wallace testified that her husband's name was Robert Warren and that on March 11, 2001, she got into an argument with him. She admitted that she struck Warren in the arm with a high-heeled shoe. However, she stated that hitting someone with a shoe was "[n]ot really" violent.

Wallace testified that she knew that the Defendant was a jealous man, but she stated that the victim never told her that the Defendant was jealous. She indicated that the Defendant was jealous of the victim because he loved her. Wallace noted that the Defendant thought that the victim cheated on him, and she reported that he "called around" to check up on the victim. She stated that she would not make a phone call to the victim telling her not to testify. An audiotape was then played for the jury.

After the tape was played, Wallace admitted that it was her voice on the tape and that she had called the victim while this case was pending. She acknowledged that she told the victim, "If you dig one ditch you better dig two." She testified that it was "just a slang of speech." She stated that every time she called the victim's home, the victim would "never" allow her to talk to the Defendant. She testified that the victim owed her money. Wallace testified that she "heard" that the Defendant beat the victim while she was pregnant, but she stated that the victim said that the Defendant "didn't do nothing to her."

Kena Clayborn, the Defendant's cousin, testified that she grew up in the home with the Defendant from the time she was ten years old until she turned eighteen years old. She stated that she also "grew up around" the victim. Clayborn testified that the Defendant and the victim visited her house once after they were married, but she stated that she never went to their house. She indicated that she did not see the Defendant and the victim socially.

Clayborn testified that during the prior year, she moved in with her aunt, Dorothy Wallace, because Clayborn had been involved in a domestic violence situation. She recalled that while she was living with Wallace, the victim visited every day. Clayborn testified that when she first moved in with her aunt, the Defendant was in jail. However, she stated that when the Defendant was released, he also moved in with her aunt. Clayborn testified that the victim continued to visit every day, even after the Defendant moved in. She recalled that the victim sometimes brought her children to visit.

Clayborn reported that Dorothy Wallace told the Defendant that she was concerned about the victim visiting while he was there. She stated that she believed Wallace also informed the victim of her concerns. Clayborn testified that the victim told her that the Defendant was "no good" and about "how he was in bed." She stated that on one evening, the victim "cursed [the Defendant] out," but he later went home with her. Clayborn testified that the Defendant did not do anything when the victim "talked badly" to him. She stated that the Defendant told her that the victim verbally abused him and that it bothered him. Clayborn recalled that at some point, the Defendant moved back in with the victim.

On cross-examination, Clayborn testified that she had been in an abusive relationship in which she was the victim. She acknowledged that her abuser was suspicious and jealous of her. Clayborn stated that she obtained an order of protection against her abuser, but that did not work so she moved. She testified that when she was in the abusive relationship, she talked about her abuser to her friends and "cursed about him." However, she acknowledged that what she said did not justify her abuser beating her. Clayborn agreed that there was a lot that she did not know about the relationship between the Defendant and the victim.

The Defendant testified that he was thirty-four years old. He stated that he had known the victim for about ten years and that he had been married to her for about three years. The Defendant testified that he did not meet the victim until they were adults. He stated that he and the victim have three children. The Defendant testified that when he and the victim got married on September 3, 1997, he and the victim already had one child.

The Defendant testified that his relationship with the victim was good in the beginning, but he contended that the victim changed and became verbally abusive towards him. He recalled that in the years before they got married, their relationship was "rocky." The Defendant testified that he was married when he began seeing the victim. He maintained that he loved the victim, and he believed that his love for the victim would change her.

The Defendant testified that on December 31, 1999, the victim invited a number of people over to her house to celebrate the new year. He recalled that his sister, Debra Rivers, his nieces, and his children attended the party. The Defendant testified that he was "very anti-social because of the emotional abuse that [he] had [gone] through with [the victim]." He recalled that on the evening of the party, he was in his bedroom when he heard an altercation between the victim and his sister about the baby. The Defendant testified that he told the victim, "I know you're not going to fight my sister in this house." He reported that his sister told him that she was tired of the victim verbally abusing him.

The Defendant indicated that the next morning, he heard the victim talking on the phone to someone. He alleged that the victim was talking about him "like a dog" and telling the person what she was going to do to the Defendant's sister. He stated that after the victim got off of the phone, he asked her why she talked about him while he was right beside her. The Defendant testified that the victim began to verbally abuse him again, and he did not say anything else.

The Defendant testified that he slept in the same bed with the victim between New Year's Eve and the day of the offense. However, he stated that he did not really see her during the day. He recalled going to work on January 3, 2000 and returning home around 3:30 p.m. The Defendant believed that he met the victim in North Memphis around 6:00 p.m. He stated that he and the victim "probably" watched television before going to bed. The Defendant testified that the victim went to sleep. He testified, "I sat and I thought about all the abuse that this woman had took me through: the pain, the hurt, the humiliation that she had caused me in front of my family members, in front of her family members, and even in front of my children." The Defendant stated, "I snapped." He explained that he "lost control" and "stabbed her."

The Defendant testified that he remembered getting the knife that he used to stab the victim from the kitchen. When asked what was going through his mind when he stabbed the victim, the Defendant responded, "I didn't think about it. I didn't care what happened to me. I didn't care whether I went to jail. I didn't care. All I cared about [was] the hurt that she caused me." He maintained that after the victim woke up, he did not try to stab her again. He stated that he called 911. The Defendant testified that he also stabbed the victim in the chest.

The Defendant recalled hearing the victim gasp for air, and he stated that he got scared. He testified that the victim asked him: "Who did this to me?" He stated that he responded that he did. The Defendant initially testified that the victim did not ask him why he did that to her, but then he changed his testimony and stated that she did ask. He stated that he responded that he stabbed her because of the years of abuse. The Defendant testified that the victim asked him to call 911, so he did. He maintained that he did not want her to die.

The Defendant testified that he was afraid to tell the 911 operator that he stabbed his wife. He stated that the 911 operator told him to wrap a towel around the victim's neck, which he claimed he did. The Defendant testified that before the ambulance arrived, he and the victim were "indulging in conversation." He stated that he told the victim how much he loved her and that they would probably never be together again. The Defendant testified that he waited for the ambulance to arrive, but he ran when he saw the police.

The Defendant admitted that he called the victim after he was released from jail. He stated that when the victim got out of the hospital, a man named Dewayne Warren stayed with her. The Defendant recalled that the victim called him and said that Warren was going to spend the night with her. He acknowledged that her call made him jealous. The Defendant testified that he "snuck around" the victim's house to see if she was sleeping with Warren. He maintained that he did not initiate the call. Rather, he stated that the victim called his mother, and his mother told him. The Defendant testified that he then called the victim from a pay phone.

The Defendant testified that he was released from jail during the summer of 2000 and went to live with his mother. He alleged that the victim came to his mother's house every day after he was released from jail and that she brought the children on several occasions. The Defendant testified that he loved his children and that they loved him. He stated that he was not worried about violating

his protective order because while he was in jail, he "gave [his] life to the Lord Jesus Christ." He indicated that he prayed for his marriage to be restored. The Defendant testified that he eventually moved back in with the victim. He maintained that the victim was more worried about him cheating on her than him stabbing her. The Defendant testified that his mother helped him and the victim buy the van that she was driving at the time of trial.

The Defendant testified that he moved out of the victim's home in March 2001. He stated that the victim continued to verbally abuse him when he moved back in with her. The Defendant maintained that he believed that God had restored his marriage and that the victim had forgiven him for the crime he committed. He testified that he moved out because he "decided God was telling [him] look, it's time to go before something else happens." He acknowledged that he moved back in with his mother on the day before his trial.

On cross-examination, the Defendant denied ever calling his mother's house to check up on the victim. He agreed that people in every marriage argue and that arguments do not excuse cutting someone's throat. The Defendant acknowledged that he was arrested for assaulting his wife while she was pregnant. He stated that he understood that as a condition of his release, he was not to have contact with the victim. However, he admitted that he contacted the victim to ask her why she lied. The Defendant maintained that he pled guilty to something that he did not do.

The Defendant testified that the victim threw the party on December 31, 1999 and that he did not have any input. He acknowledged that several members of his family attended. The Defendant stated that at some point during the evening, Octavia Rivers was holding his baby. He testified that the argument with his sister began because Octavia Rivers was holding the baby. He noted that after he argued with his sister, the victim and his sister began arguing.

The Defendant testified that his baby slept in the bed with him and the victim. He also acknowledged that on January 1, 2000, there was a phone in their bedroom. Upon questioning by the State concerning whether the Defendant decided he had endured enough verbal abuse and wanted "to end it," the Defendant responded, "I made a choice." He stated that after he made his choice, he went to the kitchen to get a knife. The Defendant admitted that he picked the baby up out of the bed and put him in another room. He testified that he "probably" took the phone out of the room because he did not want the victim to be able to reach for the phone. The Defendant then told the jury that he did not stab his wife with a knife. He stated, "I actually tried to kill my wife with an axe." He further stated, "I was trying to kill her." The Defendant testified that after using the axe, he stabbed his wife with the knife. He indicated that he stabbed the victim in the chest and in both arms. He also indicated that when the victim tried to grab the knife, he cut her hand.

The Defendant testified that when he called 911, he lied about what really happened. He admitted that he told the 911 operator that the victim cut herself. The Defendant maintained that he tried to save the victim by putting a towel on her neck. He admitted that when he saw police, he ran, and they had to chase him. The Defendant testified that he saw the blood on the victim after he stabbed her. He stated that the blood on his shirt was probably his own. He acknowledged that after

-12-

his arrest, he was ordered not to have contact with the victim. However, he testified that he did have contact with the victim after his arrest. The Defendant admitted that he went to the victim's house to see if she was with another man. He also admitted that he called her on the phone and told her that he was not lurking around her house. The Defendant testified that he was arrested for harassment. He testified that he moved back in with the victim, violating his bond agreement.

The Defendant testified that prior to marrying the victim, he was married to Denise Daniels. He admitted that he also cut Daniels' throat.

On re-direct examination, the Defendant testified that Kena Clayborn was living with his mother when he got out of jail. He acknowledged that he would confide in Clayborn about his problems.

The prosecution called Ramona Stewart as a rebuttal witness. Stewart testified that she was twenty-four years old and that the victim was her aunt. She stated that the Defendant and the victim "got along good [sic]." Stewart indicated that she attended the party at the victim's home on December 31, 1999, and she recalled that the Defendant spent a lot of the evening in his bedroom. She also recalled that at some point in the evening, Octavia Rivers was holding the victim's baby, and an argument ensued because of her holding the baby. According to Stewart, while Octavia Rivers was holding the baby, the Defendant told her that she should "get her own baby." She testified that her aunt then approached the Defendant and said something to him.

Stewart testified that she saw the Defendant and the victim on January 3, 2000. She recalled that they came to her house after being at LeBonheur Hospital. Stewart testified that the Defendant and the victim appeared to be getting along. She maintained that the Defendant did not move in with the victim after he was released from jail. On cross-examination, she testified that her aunt did not say that she was tired of hearing the victim talk about the Defendant.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of attempted first degree murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this

Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

We conclude that sufficient evidence was presented for a rational jury to find the Defendant guilty of attempted first degree murder. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part . . . ." Tenn. Code Ann. § 39-12-101(a)(2). First degree premeditated murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also noted that the jury may infer premeditation from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. See State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

In this case, evidence was presented that the Defendant stabbed the victim while she was sleeping. The victim testified that three days after the New Year's Eve party, she woke up in the

middle of the night to find her throat cut and the Defendant standing over her with a knife. She stated that she pleaded with the Defendant to call an ambulance; however, he cut her again on the chest and hands. The victim noted that although the 911 operator told the Defendant to place a towel on the victim's neck to save her, he instead took the victim's money and left. In addition, the Defendant testified that he used an axe, as well as a knife, to injure the victim. He testified that he was "trying to kill" the victim. We also note that prior to the attack, the Defendant took his infant son out of the bedroom where he was sleeping with the victim. He also acknowledged that he took the telephone out of the victim's bedroom so that she could not call for help. We conclude that sufficient evidence existed for the jury to find that the Defendant acted with premeditation when he attempted to kill the victim.

## B. Admission of Photographs

The Defendant next argues that the trial court erred by admitting four photographs of the crime scene into evidence. The Tennessee Supreme Court has determined that the admissibility of photographs is a matter within the discretion of the trial court, and a trial court's ruling concerning the admission into evidence of photographs "will not be overturned on appeal except upon a clear showing of an abuse of discretion." State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978). "To be admissible, photographs must be relevant to some issue at trial and their probative value must outweigh their undue prejudicial effect, if any." State v. Gann, 733 S.W.2d 113, 115 (Tenn. Crim. App. 1987).

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We conclude that the trial court did not abuse its discretion by allowing the State to introduce four photographs of the bed where the victim was stabbed. The Defendant argues that the trial court should have limited the number of photographs admitted into evidence because they were "unnecessary." However, as the State points out, the photographs corroborated different details of the victim's testimony. The photographs showed from several different angles the bed in which the victim was stabbed. We conclude that the photographs were relevant to corroborate the victim's testimony and that their probative value was not substantially outweighed by undue prejudice. In addition, we note that the decision to admit or limit cumulative evidence rests within the sound discretion of the trial court. State v. Kenn, 31 S.W.3d 196, 231 (Tenn. 2000). "[A] relevant photograph is not rendered inadmissible merely because it is cumulative." Id. This issue is without merit.

## C. Jury Instructions

The Defendant argues that the trial court erred by instructing the jury as to the definition of voluntary manslaughter contained in the Tennessee Pattern Jury Instructions and by failing to give the special jury instructions that he requested. "[A] defendant has a constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). However, when jury instructions are full, fair, and accurate statements of the law, a trial court is not required to provide special instructions. State v. Mann, 959 S.W.2d 503, 521 (Tenn. 1997); State v. Kelley, 683 S.W.2d 1, 6 (Tenn. Crim. App. 1984); State v. Chestnut, 643 S.W.2d 343, 352 (Tenn. Crim. App. 1982). It is not error for a trial court to deny a request for special instructions when the court's instructions on a matter are proper. State v. Vann, 976 S.W.2d 93, 114 (Tenn. 1998).

The Defendant contends the trial court erred in refusing to give the following requested jury instructions:

SPECIAL JURY INSTRUCTION NUMBER I

If the excitement and passion adequately aroused, obscures the reason of the defendant, the killing will be reduced to manslaughter. A defendant acting under such temporary mental stress is presumed to be incapable of malice, an[] essential ingredient of murder. (State v. Thornton, 730 S.W.2d 309 (1987).

DEFENDANT'S REQUEST FOR SPECIAL JURY INSTRUCTION NO. 2

2. Ladies and Gentlemen of the Jury, I further instruct you that if you find that the provocation is merely a figment of the Defendant's imagination as the basis of the Defendant's provocation for his conduct involving male and relationships, such can be considered as adequate provocation to reduce the charge to attempt to commit voluntary manslaughter. (STATE V. BUTTREY, 756 S.W.2d 718 (1988).

DEFENDANT'S REQUEST FOR SPECIAL JURY INSTRUCTION NO. 3

3. Ladies and Gentlemen of the Jury, I further instruct you that if you find from the proof that the Defendant acted in a calm and casual manner after the attempted homicide took place, you must view such proof that this was a case of suppressed anger, and thus you must take into consideration that suppressed anger is a common accompaniment of passion, the deepest and most powerful emotion. (WHITSETT v. STATE, 299 S.W.2d 2 (1957).

Voluntary manslaughter is an "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code. Ann. § 39-13-211(a). Following a hearing, the trial court in this case instructed the jury as follows regarding voluntary manslaughter:

The essential elements necessary to constitute Voluntary Manslaughter are:

(1) that the defendant unlawfully killed the alleged victim;

and

(2) that the defendant acted intentionally or knowingly;

and

-16-

(3) that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The distinction between voluntary manslaughter and second degree murder is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The trial court stated that its charge to the jury was based on the Tennessee Pattern Jury Instructions. See T.P.I. Crim. § 7.06 (3d ed.).

We conclude that the trial court fairly submitted the legal issues to the jury, and it did not mislead the jury. We believe that the jury instruction given by the trial court properly informed the jury that in order to find the Defendant guilty of attempted voluntary manslaughter, it must find that the Defendant knowingly or intentionally attempted to kill the victim as a result of a state of passion produced by adequate provocation to lead a reasonable person to act in an irrational manner. We conclude that the Defendant's first proposed instruction was substantially similar to the instruction given by the trial court. Furthermore, we conclude that the Defendant's reliance on State v. Buttrey, 756 S.W.2d 718 (Tenn. Crim. App. 1988), for his second proposed instruction is misplaced. In that case, our Court stated that the notion that the defendant's wife was unfaithful was "nothing more than a figment of [the defendant's] imagination" and thus not adequate provocation for his actions. Id. at 721.

Finally, we conclude that the Defendant's reliance on Whitsett v. State, 299 S.W.2d 2 (Tenn. 1957), for his third proposed instruction is also misplaced. The Defendant states in his proposed instruction that if the proof established that the Defendant acted in a calm and casual manner after the attempted homicide, then such was proof of suppressed anger which is "a common accompaniment of passion, the deepest and most powerful emotion." However, after a careful reading of Whitsett, we note that the Tennessee Supreme Court was referring to a defendant's behavior prior to the offense. See id. at 327-28. Our supreme court stated that the defendant's casual and calm behavior after hearing of his wife's infidelity did not rebut the finding that he was guilty of voluntary manslaughter. See id. at 328.

The Defendant also argues that the trial court misstated the law concerning crimes of violence arising out of marital relationships. The Defendant contends that domestic violence cases are an exception to the general rules regarding murder because "such homicides many times result from inherent passion that clouds one state of mind." We disagree. The elements of an offense are not altered simply because the crime occurred in a domestic situation. We note that the jury instructions given by the trial court included "that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." This language includes the passion of which the Defendant speaks. However, such passion must be proven in order to reduce to the crime to voluntary manslaughter and cannot merely be presumed because the victim and the defendant are in a marital relationship. This issue is without merit.

Accordingly, we AFFIRM the judgment of the trial court.

_____

ROBERT W. WEDEMEYER, JUDGE